UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, the Commission of La Cosa Nostra, Anthony Salerno, a/k/a "Fat Tony," Matthew Ianniello, a/k/a "Matty the Horse," Anthony Provenzano, a/k/a "Tony Pro," Nunzio Provenzano, a/k/a "Nunzi Pro," Anthony Corallo, a/k/a "Tony Ducks," Salvatore Santoro, a/k/a "Tom Mix," Christopher Furnari, Sr., a/k/a "Christie Tick," Frank Manzo, Carmine Persico, a/k/a "Junior," "The Snake," Gennaro Langella, a/k/a "Gerry Lang," Philip Rastelli, a/k/a "Rusty," Nicholas Marangello, a/k/a "Nicky Glasses," Joseph Massino, a/k/a "Joey Messina," Anthony Ficarotta, a/k/a "Figgy," Eugene Boffa, Sr., Francis Sheeran, Milton Rockman, a/k/a "Maishe," John Tronolone, a/k/a "Peanuts," Joseph John Aiuppa, a/k/a "Joey O'Brien," "Joe Doves," "Joey Aiuppa," John Phillip Cerone, a/k/a "Jackie the Lackie," "Jackie Cerone,"

Joseph Lombardo, a/k/a "Joey the Clown," Angelo Lapietra, a/k/a "The Nutcracker," Frank Balistrieri, a/k/a "Mr. B," Carl Angelo Deluna, a/k/a "Toughy," Carl Civella, a/k/a "Corky," Anthony Thomas Civella, a/k/a "Tony Ripe," General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Jackie Presser, General President, Weldon Mathis, General Secretary–Treasurer, Joseph Trerotola, a/k/a "Joe T," First Vice President, Robert Holmes, Sr., Second Vice President, William J. McCarthy, Third Vice President, Joseph W. Morgan, Fourth Vice President, Edward M. Lawson, Fifth Vice President, Arnold Weinmeister, Sixth Vice President, John H. Cleveland, Seventh Vice President, Maurice R. Schurr, Eighth Vice President, Donald Peters, Ninth Vice President, Walter J. Shea, Tenth Vice President, Harold Friedman, Eleventh Vice President, Jack D. Cox, Twelfth Vice President, Don L. West, Thirteenth Vice President, Michael J. Riley, Fourteenth Vice President, Theodore Cozza, Fifteenth Vice President, Daniel Ligurotis, Sixteenth Vice President, Salvatore Provenzano, a/k/a "Sammy Pro," Former Vice President, Defendants.

No. 88 CIV. 4486 (DNE).

United States District Court,
S.D. New York.

Aug. 19, 1992.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Steven C. Bennett, Christine Chung, Asst. U.S. Attys., of counsel), for the U.S.

Cohen, Weiss & Simon, New York City (Richard N. Gilberg, Richard M. Seltzer, Stephen Presser, of counsel), for the International Broth. of Teamsters.

Frederick B. Lacey, Independent Adm'r of the International Broth. of Teamsters, Newark, N.J.

OPINION & ORDER

EDELSTEIN, District Judge:

## TABLE OF CONTENTS

I. BACKGROUND ............................................................. 766

 A. The Government's Suit ........................................... 766
 B. The Court Appointed Officers ................................... 767
 C. The Independent Review Board .................................. 768
 D. History of Consent Decree Litigation ........................... 769
 1. New York Office Space ...................................... 769
 2. Election Officer's Authority to Supervise 1991 IBT Election ........ 770
 a. Scope of Election Officer's Authority ..................... 770
 b. Election Officer's Staffing Requests ...................... 771
 c. Fund ................................................... 771
 d. Certification ............................................ 771
 3. Communication with the Membership ......................... 772
 4. Investigations Officer's Authority to Examine Books .......... 772
 5. Independent Administrator's Power to Interpret IBT Constitution.... 772
 6. All Writs Act Jurisdiction .................................. 773
 7. Names of IBT Members Facing Discipline .................... 773
 8. Election Rules ............................................. 774
 9. Formal Ratification of the Consent Decree at 1991 IBT Convention ... 774
 E. Drafting Constitutional Amendments ............................ 776
 1. Process of Incorporation ................................... 776
 2. Section G and the IBT's Proposed Ethical Practices Committee .... 776
 F. The Instant Application ......................................... 776

II. DISCUSSION ................................................................776
 A. Consent Decree Law ....................................................777
 B. Prior Interpretations of the Consent Decree...........................778
 C. Promulgation of Rules for IRB Operation Is Consistent with the
 Language and Purpose of the Consent Decree and the Intent of the
 Parties ...............................................................779
 1. The Government's Application Is Proper.............................779
 2. The IRB as Revealed Through the Language and Purpose of the
 Consent Decree and the Intent of the Parties .....................780
 3. Absence of Rules Threatens the IRB's Ability to Fulfill Its
 Crucial Role under the Consent Decree.............................781
 D. Promulgation of Rules Is Consistent with other Proffered Principles
 and Policies...........................................................783
 1. The Government Did Not Waive Its Right to Bring This Applica-
 tion..............................................................783
 2. Federal Labor Policy Favors Promulgation of These Rules .........784
 3. The Current IBT Administration's Stance Toward Reform Does
 Not Affect the Propriety of These Rules ..........................785
 4. Cost .............................................................788
 E. The Rules ............................................................790
 1. Individual IRB Member Action.....................................790
 2. Scope of IRB Investigative Authority ............................791
 3. Enforcement ......................................................792
 4. Cooperation ......................................................793
 5. Review of IBT Decisions .........................................793
 6. Communication ....................................................794
 7. IRB Voting .......................................................794
 8. Staff for IRB Members............................................795
 9. Independence of IRB Members.....................................796
 10. Indemnification of IRB Members ................................797
 11. Applications ...................................................797
 12. Investigative Reports and IBT Action ..........................797
 13. Compensation of IRB Members ...................................798

III. CONCLUSION ..............................................................799

This Opinion emanates from the voluntary settlement in the action commenced by the plaintiff United States of America (the "Government") against, *inter alia*, the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). Pursuant to Section K.16 of the Consent Decree, the Government has made an application to this Court involving Section G of the Consent Decree, which provides for the establishment of an Independent Review Board (the "IRB" or "Review Board"). Specifically, the Government seeks to promulgate rules for the operation of the IRB and its staff. For the reasons stated be-low, the Government's application is granted as modified. The Rules and Procedures for Operation of the Independent Review Board for the International Brotherhood of Teamsters (the "Rules") are attached to this Opinion as Exhibit A.

## I. BACKGROUND

### A. The Government's Suit

On June 28, 1988, the Government filed this civil action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, against the IBT, its GEB, the individual members of the GEB, the Commission of La Cosa Nostra, and 26 alleged members of La Cosa Nostra. The Government alleged that the Union suffered from rampant cor-

ruption and La Cosa Nostra domination. In order to purge the IBT of these nefarious influences and restore union democracy, the Government sought sweeping relief, including the appointment of court liaison officers vested with certain powers of the IBT General President and the GEB and with authority to supervise general elections for IBT International Union Officers.

On the eve of trial, March 14, 1989, the IBT and the Government settled the action and entered into the Consent Decree. In the precatory paragraphs of the Consent Decree, the IBT admits "that there have been allegations, sworn testimony and judicial findings of past problems with La Cosa Nostra corruption of various elements of the IBT." Consent Decree, at p. 2 (fourth Whereas clause). Based on this admission, the IBT agrees "that there should be no criminal element or La Cosa Nosa corruption of any part of the IBT." *Id.* (fifth Whereas clause). Moreover, the IBT agrees "that it is imperative that the IBT, as the largest trade union in the free world, be maintained democratically, with integrity and for the sole benefit of its members without unlawful outside influence." *Id.* (sixth Whereas clause). The framework of reform sought by the Government in its Complaint was preserved in the Consent Decree in order to achieve these goals.

### B. The Court–Appointed Officers

Pursuant to Section F of the Consent Decree, this Court appointed three officers: an Independent Administrator, an Investigations Officer, and an Election Officer (collectively, the "Court–Appointed Officers"). In May 1989, this Court appointed Frederick B. Lacey to serve as the Independent Administrator, Charles M. Carberry to serve as the Investigations Officer, and Michael H. Holland to serve as the Election Officer.

The Independent Administrator is vested with a broad range of powers under the Consent Decree, including: (1) the disciplinary powers of the General President and the GEB, which he may use to eradicate corruption within the IBT and to appoint temporary trustees for distressed Locals; (2) the power to review all disciplinary and trusteeship decisions of the General President and the GEB; and (3) the authority to veto proposed or actual expenditures, contracts, and appointments if he believes that such conduct furthers an act of racketeering. Consent Decree, §§ F.12(A)–(B). The Investigations Officer has authority to investigate corruption in the IBT and to bring disciplinary charges before the Independent Administrator. *Id.*, § F.12(A). The Consent Decree also provides for the first direct rank-and-file secret ballot election for International Union Officers and authorizes the Election Officer to supervise it. *Id.*, § F.12(D). Any Court–Appointed Officer, as well as any party, may make an application to this Court to resolve an issue involving the Consent Decree. *Id.*, §§ F.12(I), K.16.

In fulfilling his mandate under the Consent Decree, the Investigations Officer has filed charges against 185 individuals and three Local Unions. These charges resulted from investigations that entailed examining books and records, interviewing and taking testimony from union officers and members, reviewing information supplied by IBT members, and taking sworn statements. The Independent Administrator has conducted at least 73 hearings on disciplinary charges brought by the Investigations Officer, rendered numerous decisions, imposed at least 9 trusteeships on IBT Locals, and decided over 250 appeals from decisions of the Election Officer on election protests. The Independent Administrator has also reviewed appointments, expenditures, the handling of funds, and transfer of assets, and has communicated with the membership through the IBT magazine while also supervising the magazine's publication. The Election Officer supervised all aspects and stages of the first IBT secret ballot rank-and-file election, including the election of delegates to the IBT Convention from the over 600 IBT Local Unions, the nominations for International Union Office at the IBT Convention, and the approximately 1.5 million member rank-and-file general election of International Union Officers. The Election Officer certified the results of the election on January

22, 1992, which saw Mr. Ronald C. Carey elected IBT General President.

### C. The Independent Review Board

The certification of the election results marks a point of transition in the Consent Decree. The termination of the Court–Appointed Officers' authority is related to this event, and indeed, their terms of office will soon end. *See* Consent Decree, § B.3(2). Certification of the election results, however, also heralds the birth of the Independent Review Board, which is the subject of this application. The Consent Decree provides that "[f]ollowing the certification of the 1991 election results, there shall be established an Independent Review Board." *Id.*, § G.

The IRB is to consist of three members, one chosen by the Attorney General of the United States on behalf of the Government, one chosen by the IBT, and a third person chosen by the Attorney General's and the IBT's designees. *Id.*, § G. The Attorney General chose Frederick B. Lacey, currently the Independent Administrator, as his designee on March 8, 1992. The IBT chose Harold E. Burke, special assistant to IBT General President Ronald C. Carey, as its designee on April 9, 1992. After these two designees reached an impasse on the selection of a third IRB member, this Court confirmed the Independent Administrator's nomination of William H. Webster[1] to serve as the third member of the IRB on August 4, 1992. (Transcript of August 4, 1992 Hearing, pp. 35–36).

The Consent Decree addresses various aspects of IRB operation, including general matters of IRB administration, the IRB's disciplinary powers, and the investigatory and disciplinary process. As to general administration, for instance, the Consent Decree touches upon such matters as funding and staffing. Section G(1) states that "the IBT shall pay *all costs and expenses* of the [IRB] and its staff (including all salaries of [IRB] members and staff)."

Consent Decree, § G(1) (emphasis added). In addition, the IRB may hire a staff of investigators and attorneys to assist in the performance of its duties. *Id*, § G(a).

The Consent Decree also sets forth the IRB's investigatory and disciplinary powers, and a process for acting on the results of its investigations. The IRB is vested with the same investigatory authority as enjoyed by the General President and the General Secretary–Treasurer under the IBT Constitution and applicable law. *Id.*, § G(b). The IRB must use this authority to investigate, *inter alia*, (1) "any allegations of corruption," (2) "any allegations of domination or control or influence of any [part of the] IBT ... by La Cosa Nostra or any other organized crime group, and (3) "any failure to cooperate fully with the Independent Review Board." *Id.*, § G(a).

Upon completing an investigation, the IRB must issue a written report (the "Investigative Report") setting out its charges, findings, and recommendations concerning a disciplinary or trusteeship matter. *Id.*, § G(d). The Investigative Report is then referred to an appropriate IBT entity, which must "promptly take whatever action is appropriate under the circumstances." *Id.*, § G(e). "Within 90 days of the referral, the IBT entity must make written findings setting forth the specific action taken and the reasons for such action." *Id.*

The IRB's role in a particular matter does not end upon this referral to an IBT entity. Instead, the IRB must monitor its referrals. If the IRB determines that the IBT entity has not pursued a referred matter in "a lawful, responsible, or timely manner," or that the IBT entity's proposed resolution "is inadequate under the circumstances," the IRB must notify the relevant IBT entity of its determination and the reasons for it. *Id.*, § G(f). Within 10 days of the IRB's notice, the relevant IBT entity must "set forth in writing any and all additional actions it has taken and/or will take to correct the defects set forth in [the] notice and a deadline by which said action

---

1. Judge Webster has served as United States Attorney for the Eastern District of Missouri, United States District Judge for the Eastern District of Missouri, Judge on the United States Court of Appeals for the Eighth Circuit, Director of the Federal Bureau of Investigations, and Director of Central Intelligence.

may be completed." *Id.*, § G(g). The IRB shall "immediately thereafter" issue a written determination "concerning the adequacy of the additional action taken and proposed by the IBT entity." *Id.* If the IRB finds that the IBT entity has not remedied the defects specified in the IRB's notice, the IRB promptly shall convene a hearing. *Id.*

The IRB assumes an adjudicatory role at this hearing, which is meant to determine an appropriate course of action in a particular matter. After conducting a "fair hearing" pursuant to the rules and procedures generally applicable to a labor arbitration hearing, the IRB must issue a written decision, which "shall be final and binding." *Id.*, §§ G(h), (i). The GEB must then take whatever action is necessary to implement the decision, "consistent with the IBT Constitution and applicable Federal laws." *Id.*, § G(i). The IRB, however, is empowered to examine and review the GEB's implementation of the IRB's decisions; if the IRB is dissatisfied with the GEB's efforts, the IRB has "the authority to take whatever steps are appropriate to insure proper implementation" of its decision. *Id.*, § G(j).

In addition to initiating an investigation, which results in the filing of an Investigative Report and the process just described, the IRB also may review the GEB's own disciplinary and trusteeship decisions. *Id.*, § G(k). After such review, the IRB may make a determination, which is final and binding, that affirms, modifies, or reverses any such GEB decision. *Id.*

In sum, Section G of the Consent Decree empowers the IRB to eradicate corruption in the IBT on its own initiative and to monitor IBT efforts to purge corruption in the Union. In this way, the IRB may be considered a successor to the Investigations Officer and the Independent Administrator. Its activities, however, are limited to the disciplinary sphere of union activity; it has no involvement in the "day-to-day" operations of the Union.

### D. History of Consent Decree Litigation

The Consent Decree introduced a series of measures designed to reform the IBT by eliminating corrupt influences and restoring democratic practices. As a party to the Consent Decree, the IBT agreed, of course, to the process of reform. The implementation of reform could have been characterized by a unity of purpose and a spirit of cooperation between the parties. Soon after the signing of the Consent Decree, however, the IBT embarked on a fierce campaign to avoid the reforms that it agreed to in the Consent Decree. In over three years of constant litigation in this Court and the Court of Appeals, the IBT repeatedly has sought to advance its cause by arguing for a narrow, restrictive interpretation of the Consent Decree.[2]

#### 1. New York Office Space

The first dispute involving an interpretation of the Consent Decree came before

---

**2.** The history recounted here is not an exhaustive account of the litigation in this case. This Court has been called upon to resolve a number of other issues under the Consent Decree. *See, e.g.,* July 14, 1992 Opinion & Order, 803 F.Supp. 748 (S.D.N.Y.1992); July 13, 1992 Opinion & Order, 803 F.Supp. 740 (S.D.N.Y.1992); July 9, 1992 Opinion & Order, 803 F.Supp. 734 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, 792 F.Supp. 1346 (S.D.N.Y.1992); April 27, 1992 Memorandum & Order, 791 F.Supp. 421 (S.D.N.Y.1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345 (S.D.N.Y.1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256 (S.D.N.Y.1992); January 17, 1992 Opinion & Order, 782 F.Supp. 243 (S.D.N.Y.1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238 (S.D.N.Y.1992); November 8, 1991 Memorandum & Order, slip op., 1991 WL 243268 (S.D.N.Y.1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144 (S.D.N.Y.1991),

aff'd, 954 F.2d 801 (2d Cir.1992), *cert. denied,* — U.S. —, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991 Order, slip op. (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133 (S.D.N.Y.1991); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y.1991), *aff'd mem.,* 964 F.2d 1308 (2d Cir.1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123 (S.D.N.Y.1991); August 14, 1991 Memorandum & Order, slip op. (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, slip op., 1991 WL 150226 (S.D.N.Y.1991), *aff'd mem.,* No. 91–6200 (2d Cir. Sep. 12, 1991); July 18, 1991 Memorandum & Order, slip op. (S.D.N.Y.1991), *aff'd mem.,* 956 F.2d 1161 (2d Cir.1992); July 16, 1991 Opinion & Order, slip op., 1991 WL 136029 (S.D.N.Y.1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90 (S.D.N.Y.1991), *aff'd in relevant part,* 948 F.2d 1278 (2d Cir.1991); May 13, 1991

this Court through the Independent Administrator's first application, which he filed on August 3, 1989. The dispute arose from the IBT's refusal to provide the Investigations Officer with New York City office space. The IBT argued that the Consent Decree did not expressly impose such an obligation. Then–IBT General Counsel James T. Grady stated in an affidavit that "Mr. Carberry's proposal for a New York office is contrary to the unequivocal language of the Consent Order." (Affidavit of James T. Grady (August 7, 1989), ¶ 12, at 6).

Resolution of the application turned on two provisions of the Consent Decree. Section F.12(C)(iii) provides that "the Independent Administrator, Investigations Officer and Election Officer shall be provided with suitable office space at the IBT headquarters in Washington, D.C." Section F.12(H) provides that "the compensation and expenses of the [Independent] Administrator, the Investigations Officer and the Election Officer (and any designee or persons hired by them) shall be paid by the IBT." Despite the absence of an express provision in the Consent Decree concerning a New York office for the Investigations Officer, this Court ordered the IBT to provide such office space. It reasoned that Section F.12(C)(iii) and Section F.12(H) encompassed the provision of office space in New York City. Such an interpretation comported with the language and purpose of the Consent Decree, and the intent of the parties. Despite this Court's order, the IBT continued to block the Investigations Officer's efforts to obtain New York office space. After a second hearing before this Court, the IBT approved a lease for the Investigations Officer.

### 2. Election Officer's Authority to Supervise 1991 IBT Election

#### a. *Scope of Election Officer's Authority*

The next dispute involving the Consent Decree, and the first that concerned the

authority of a Court–Appointed Officer, arose in Application II, which the Independent Administrator filed with this Court on September 29, 1989. This application involved the duties of the Election Officer. Until the signing of the Consent Decree, officers of IBT subordinates had been *ex officio* delegates to a convention where they directly elected the International Officers, including the General President. The Consent Decree eliminated this process of electing International Union Officers and initiated a three-stage electoral process that culminated in the 1991 direct rank-and-file secret ballot election for International Officers. *See* Consent Decree, § F.12(D). The Consent Decree provides that: (1) the Local Unions shall hold secret ballot elections of delegates to the IBT Convention; (2) these elected delegates shall attend the 1991 IBT Convention and nominate candidates for IBT International office; and (3) the rank-and-file shall vote in a union-wide, direct, secret ballot election for the candidates for International Union office. Application II resulted from a dispute over the Election Officer's authority to supervise this process. Each party offered a different interpretation of Section F.12(D) of the Consent Decree, which in pertinent part empowered the Election Officer to "supervise ... the IBT election to be conducted in 1991."

The Government asserted that the term "supervise" gave the Election Officer a broad mandate to coordinate all aspects of the electoral process. The Government also contended that the phrase "IBT election to be conducted in 1991" referred to the entire three-stage electoral process that culminated in the 1991 election of International Union Officers. The IBT adopted an extremely narrow interpretation of the term "supervise" and the phrase "IBT election to be conducted in 1991." It argued that the term "supervise" allowed the Elec-

---

Memorandum & Order, 764 F.Supp. 817 (S.D.N.Y.1991); April 18, 1991 Opinion & Order, 761 F.Supp. 315 (S.D.N.Y.1991); December 27, 1990 Opinion & Order, 754 F.Supp. 333 (S.D.N.Y.1990); September 18, 1990 Opinion &

Order, 745 F.Supp. 189 (S.D.N.Y.1990); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991).

tion Officer merely to oversee the IBT electoral process and provide post-election advice. The IBT also argued that the phrase "IBT election to be conducted in 1991" referred not to the entire three-stage electoral process, but only to the general rank-and-file election of International Union Officers. The IBT reasoned that the disputed phrase refers to a single election—the election for International Union office—and not multiple elections. It supported its interpretation with affidavits that contained drafts of the Consent Decree before its final incarnation.

This Court interpreted the term "supervise" as having its most "expansive and proactive meaning." October 18, 1989 Opinion & Order, 723 F.Supp. 203, 206 (S.D.N.Y.1989), aff'd, 931 F.2d 177 (2d Cir. 1991).[3] In addition, this Court interpreted "election to be conducted in 1991" as encompassing the entire three stages of the electoral process, including Local Union election of delegates to the 1991 IBT Convention. Id. at 207. Such an interpretation, which vested the Election Officer with "authority to carry out ... any and all facets of the IBT electoral process up to and including the 1991 election for International Officers," was necessary to realize the Consent Decree's goal of restoring democracy to the IBT. Id. Based on this interpretation, the Election Officer could promulgate election rules and procedures, educate IBT Locals on the election process, monitor candidate campaigning, devise absentee voting procedures, and certify all elections. Id. Further, this Court found that "it is within the scope of the duties of the Election Officer to take any further reasonable actions necessary to carry out his duties ... and ensure fair elections for the IBT membership." Id.

### b. Election Officer's Staffing Requests

Another aspect of Application II involved the Election Officer's staffing request. The Election Officer requested that the IBT pay for support staff, including an executive assistant, an administrative assistant, a secretary, and a labor economics consultant. Id. at 208. The IBT opposed these requests because the Consent Decree did not explicitly provide the Election Officer with a staff. The IBT viewed "the Elections Officer's staffing requests as arming him for an unwarranted and exceedingly expensive intrusion into the IBT electoral process." Id. at 208. This Court granted the Election Officer's request. It found that the Election Officer required a staff to perform the vast number of tasks involved in "supervising" all aspects of the IBT electoral process. Thus, implementation of the Consent Decree—in this case, enabling the Election Officer to perform necessary tasks—compelled provision of a staff, even in the absence of an express staffing provision.

### c. Fund

The final aspect of Application II involved the Government's desire to create, at its own expense, a $100,000 operating fund for the Court Officers. The IBT opposed the Government's request because the Consent Decree did not expressly provide for the creation of such a fund. This Court rejected the IBT's position and found that although the Consent Decree did not explicitly allow it, creation of such a fund facilitated the Court–Appointed Officers' ability to operate, and was thus necessary to implementation of the Consent Decree. Id. at 210.

### d. Certification

On October 27, 1989, the IBT moved to certify for appeal issues resolved in this Court's October 18, 1989 decision and to stay those rulings pending appeal. This Court denied the IBT's motion for certification because this Court's interpretation of the Consent Decree rested on well-settled principles contained in United States v. Armour & Co., 402 U.S. 673, 683, 91 S.Ct. 1752, 1758, 29 L.Ed.2d 256 (1971) and SEC v. Levine, 881 F.2d 1165, 1178–1179 (2d

---

**3.** The opinions, memoranda, and orders filed in this case, United States v. IBT, 88 Civ. 4486 (DNE), are cited in this Opinion first by refer-

ring to the date of the order and then to the official citation.

Cir.1989). *See* November 6, 1989 Order, 728 F.Supp. 920, 922 (S.D.N.Y.1989). This Court also denied the IBT's request for a stay because, *inter alia*, "the IBT's true intention is to delay and hinder the work of the Court Officers so that their . . . term[s] will expire without significant reforms." *Id.* at 924. The IBT appealed the denial of the stay and certification requests; the Second Circuit dismissed the IBT's appeals the following day.

### 3. Communication with the IBT Membership

On November 3, 1989, the Independent Administrator filed Application VI, in which he sought an interpretation of Section F.12(E) of the Consent Decree. This section provides, in relevant part, that the Independent Administrator shall have the "authority to distribute materials at reasonable times to the membership of the IBT about the Administrator's activities. . . . Moreover, the [Independent] Administrator shall have the authority to publish a report in each issue of the *International Teamster* concerning the activities of the [Independent] Administrator, Investigations Officer, and Election Officer." Pursuant to his authority under this provision, the Independent Administrator included reports in the IBT's monthly publication of the *International Teamster*.

This application arose in response to the IBT's threat to discontinue publishing the *International Teamster* on a monthly basis, and to begin quarterly publication. The Independent Administrator's application sought review of the IBT's proposed publication decision, which the Independent Administrator contended would impair his authority under Section F.12(E) of the Consent Decree. This Court found that Section F.12(E) authorized monthly communications between the Independent Administrator and the general membership either through the *International Teamster* or the mail. In addition, this Court ruled that the IBT had to make this Court's rulings available to the rank-and-file, either in the *International Teamster* or by direct mail. Such a holding comported with the text of Section F.12(E) and served to educate the membership, which promoted the goal of restoring union democracy. On December 13, 1989, the Second Circuit dismissed the IBT's appeal.

### 4. Investigations Officer's Authority to Examine Books

Section F.12(C)(i)(a) of the Consent Decree provides that "[t]he Investigations Officer shall have the right, [*inter alia*], to examine books and records of the IBT and its affiliates." While the IBT permitted the Investigations Officer to inspect its records, it refused to provide him with copies on the ground that the Consent Decree did not expressly impose such an obligation on the IBT. On January 30, 1990, this Court signed an Order compelling the IBT to show cause why they should not have to provide the Investigations Officer with copies of IBT records. This Court noted in the Order that the "ability to obtain copies . . . is a reasonable and necessary incident to [the Investigations Officer's] power under the Consent Order." Subsequently, the IBT voluntarily provided the Investigations Officer with copies of the documents.

### 5. Independent Administrator's Power to Interpret IBT Constitution

On January 7, 1989, the Independent Administrator filed Application VII, which involved a dispute over the Independent Administrator's authority to interpret the disciplinary provisions of the IBT Constitution. This dispute began when the GEB failed to notify the Independent Administrator of a special meeting that it held on November 1, 1989 in Washington, D.C., as required by the Consent Decree. At the meeting, the GEB passed a resolution that limited the type of conduct that brought "reproach upon the union" and thus limited the grounds for disciplining an IBT member. 1991 IBT Constitution, Art. II, § 2(a) & Art. XIX, § 6(b)(2). The GEB passed this resolution at the request of at least one of its members, then–IBT Vice President Theodore Cozza. At the time of the special meeting, the Investigations Officer already had brought disciplinary charges against Cozza for bringing reproach upon

the Union by knowingly associating with members of organized crime.[4]

The Independent Administrator rejected this resolution as an unreasonable interpretation of the IBT Constitution. The IBT appealed the Independent Administrator's decision to this Court on the ground that the Consent Decree did not specifically authorize him to interpret the IBT Constitution. This Court rejected the IBT's restrictive interpretation of the Consent Decree. March 13, 1990 Opinion & Order, 743 F.Supp. 155, 160–61 (S.D.N.Y.1990), *aff'd,* 905 F.2d 610 (2d Cir.1990). The Consent Decree expressly granted the Independent Administrator the same disciplinary authority as the IBT General President and the GEB under the IBT Constitution; this authority necessarily included the General President's and GEB's authority to interpret the disciplinary provisions of the IBT Constitution. Consent Decree, § F.12(A); *see United States v. IBT,* 905 F.2d 610, 618–19 (2d Cir.1990) (the Independent Administrator has "the final authority to determine what constitutes an offense subject to discipline under the IBT Constitution").

### 6. All Writs Act Jurisdiction

A major challenge to the Court–Appointed Officers' ability to implement the Consent Decree arose when various IBT-affiliated entities and IBT members filed lawsuits in sister federal district courts based on matters relating to the Consent Decree. These actions sought relief from this Court's orders under the Consent Decree or an adjudication of rights under the Consent Decree. The Government sought to have this Court exercise its authority under the All Writs Act, 28 U.S.C. § 1651, to enjoin all lawsuits—filed in any forum other than the Southern District of New York—that attempted to litigate issues arising under the Consent Decree. This Court granted the Government's motion based on its finding that a nationwide in-

junction would promote judicial economy, avoid repetitive and burdensome litigation, and eliminate the significant risk that collateral lawsuits would subject the Consent Decree to inconsistent interpretations. January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1047–48 (S.D.N.Y.1990), *aff'd,* 907 F.2d 277, 280 (2d Cir.1990). In addition, this Court found that "[t]his litigation has already consumed a great deal of time, expense, and energy from the Government, the IBT, and this Court, all in the hope that these resources have gone to achieve a better IBT for its members. This litigation is a unique attempt to reform the IBT, and such a situation warrants exercising this Court's extraordinary powers under the All Writs Act." *Id.* at 1045.

### 7. Names of IBT Members Facing Discipline

On January 19, 1990, the Independent Administrator filed Application VIII, in which he challenged the IBT's refusal to publish in the *International Teamster* the names of IBT members facing disciplinary charges. The Independent Administrator contended that Section F.12(E) of the Consent Decree, which authorized the Independent Administrator to distribute materials to the membership and publish reports to the membership in the *International Teamster,* permitted publication of such names. Although the Consent Decree did not specify the type of information encompassed by Section F.12(E), this Court found that "the only relevant point of inquiry is whether [Section] 12(E) of the Consent Decree should be interpreted to permit the dissemination of this information. Upon review of that provision, and the spirit and intent of the Consent Decree [the Independent Administrator's application] is granted." February 27, 1990 Memorandum & Order, 735 F.Supp. 502, 504 (S.D.N.Y.), *aff'd,* 907 F.2d 277 (2d Cir.1990).

---

**4.** The Independent Administrator subsequently found that the Investigations Officer had sustained his burden of proof with respect to the charge against Cozza. The Independent Administrator's decision was affirmed by this Court and the Court of Appeals for the Second Circuit.

October 11, 1991 Memorandum & Order, 777 F.Supp. 1127. (S.D.N.Y.1991) & May 9, 1991 Memorandum & Order, 764 F.Supp. 797 (S.D.N.Y.1991), *aff'd mem.,* 956 F.2d 1161 (2d Cir.1992).

#### 8. Election Rules

Applications X and XI involved another dispute over the Election Officer's authority to "supervise" the 1991 International Officer Election. In Application X, the Independent Administrator sought approval of the Election Officer's "Rules for the IBT International Union Delegate and Officer Election" (the "Election Rules"). In Application XI, the Independent Administrator sought approval for the Election Officer to hire Regional Coordinators and field staff to assist him in his efforts.

The IBT raised two broad objections to the Election Rules: it first argued that the Election Officer had no specific authority under the Consent Decree to promulgate election rules. This Court found the IBT's argument frivolous, already having determined that the Election Officer had power to promulgate election rules as an aspect of his authority to "supervise" the IBT electoral process. *See* October 18, 1989 Opinion & Order, 723 F.Supp. 203, 206–07 (S.D.N.Y.1989), *aff'd*, 931 F.2d 177 (2d Cir. 1991). The IBT also argued that virtually every individual Election Rule was beyond the scope of the Consent Decree and the IBT Constitution. This Court not only rejected the IBT's contention, but it also supplemented the Election Officer's proposed rules in a manner consistent with the language and purpose of the Consent Decree. For instance, Article VII, § 2(a) of the proposed Election Rules provided candidates for IBT office with only limited access to IBT membership lists. This Court rejected the proposed rule and, on its own initiative, amended the rule to allow accredited candidates access to membership lists. This Court reasoned, in part, that such an amendment was necessary because:

> The IBT has displayed a pattern of reluctance to comply with the specific terms of the Consent Decree absent judicial intervention, indicating the IBT's official opposition to reform. The IBT has refused to furnish office space and challenged the need for file cabinets; delayed in reimbursing the Court Officers, thereby necessitating the creation of a $100,-000 fund for their work ...; bitterly disputed the authority of the Election Officer to serve as more than a passive observer to the 1991 election ...; protested the hiring of staff members for the Court Officers ...; and passed resolutions changing the disciplinary provisions of the IBT Constitution in disregard of ... the Consent Decree. Those resolutions baldly exculpated a former member of the GEB who was a convicted felon from facing disciplinary charges and were determined to be unreasonable by all reviewing courts....

> The IBT attempted to curtail publication of the *International Teamster* from monthly to quarterly; sent out a memorandum to every Local urging that the Locals object before this Court to an injunction requiring all litigation concerning the Consent Decree be conducted before this Court.... The IBT currently objects to the Election Officer hiring regional coordinators to assist in supervising the election.... While not dispositive towards a finding of misuse, this pattern of conduct illuminates the IBT's official stance toward reform and supports the conclusion of official antipathy.

July 10, 1990 Opinion & Order, 742 F.Supp. 94, 104 (S.D.N.Y.1990), *aff'd*, 931 F.2d 177 (2d Cir.1991).

As to Application XI, this Court issued an Order that recognized the Election Officer's authority to hire Regional Coordinators and field staff as a reasonable exercise of his explicit authority under the Consent Decree. *Id.* at 107. With one modification to an election rule involving employer contributions, the Second Circuit affirmed this Court's decision. *See United States v. IBT*, 931 F.2d 177 (2d Cir.1991).

#### 9. Formal Ratification of the Consent Decree at 1991 IBT Convention

On March 19, 1991, the Government sought an order, based on Section D.9(b) of the Consent Decree, ensuring the incorporation of the Consent Decree into the IBT Constitution at the 1991 IBT International Convention, which was ultimately held at the Walt Disney World Dolphin Hotel, 1500 Epcot Resort Boulevard, Lake Buena Vista,

Florida. Section D.9(b) of the Consent Decree provides, in relevant part, that:

> By no later than the conclusion of the IBT Convention to be held in 1991, the IBT shall have formally amended the IBT constitution to incorporate and conform with all of the terms set forth in this [Consent Decree] by presenting said terms to the delegates for a vote.

In its application, the Government proffered evidence that the IBT would encourage Convention delegates to "vote out" the electoral provisions of the Consent Decree. May 6, 1991 Opinion & Order, 764 F.Supp. 787, 788 (S.D.N.Y.), aff'd, 940 F.2d 648 (2d Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991). The Government sought to prevent this violation of the Consent Decree, and thus avoid a situation where the IBT would revert to past electoral methods that disenfranchised the membership.

At a March 20, 1991 hearing before this Court, the IBT refused to deny the existence of a plan to "vote out" the Consent Decree. Id. at 791. The IBT argued that Sections D.9(b) and F.12(D)[5] of the Consent Decree allowed Convention delegates to nullify provisions of the Consent Decree at the 1991 IBT Convention. This Court rejected the IBT's argument. It based its conclusion on an interpretation of Sections D.9(a)–(b) of the Consent Decree. Section D.9(a) provides that "[t]he IBT Constitution shall be deemed and hereby is amended to incorporate and conform with all of the terms set forth in the [Consent Decree]." This Court found that this section provided for the automatic incorporation of the Consent Decree into the IBT Constitution. This incorporation did not require an affirmative vote at the Convention.

Section D.9(b) provides that by no later than the conclusion of the Convention, the delegates "shall have formally" ratified the Consent Decree's changes to the IBT Constitution ordered in Section D.9(a). By including Section D.9(b) in the Consent Decree, the parties intended to resolve any uncertainty about the IBT's ability to bind subordinate entities to the Consent Decree. Id. at 791–93. Indeed, initially upon presenting the Consent Decree to this Court, the parties stated that Section D.9(b) was designed to settle any legal challenge by IBT entities and did not permit the IBT to jettison parts of the Consent Decree. Id. at 792–93.[6] The provisions of the Consent Decree were part of the IBT Constitution, and bound the IBT and its subordinate entities, regardless of the delegates' vote at the IBT Convention. This ruling prevented the IBT from altering the IBT Constitution at the Convention without first receiving Government approval as required by Section L.17 of the Consent Decree.[7] This Court added:

> I remind the IBT that it *voluntarily* agreed to the Consent Decree, and with it free rank-and-file elections. The past two years have demonstrated that the IBT had no intention of living up to its end of the agreement. The IBT has made every attempt to limit the scope and restrict the terms of the Consent Decree, and each time it has lost. But the time for challenges to the Consent Decree has now passed, and the IBT must live with the Consent Decree as written by the parties, approved by the Court, and repeatedly interpreted by this Court and the Court of Appeals.

---

**5.** Paragraph F.12(D) provides in relevant part that "[a]t the 1991 International Convention, the delegates shall be presented with [the electoral provisions of the Consent Decree] for a vote."

**6.** In addition, by March 19, 1991, the issue of whether the Consent Decree bound the subordinate entities already had been conclusively determined by years of litigation. May 6, 1991 Opinion & Order, 764 F.Supp. 787, 793 (S.D.N.Y.), aff'd 940 F.2d 648 (2d Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991).

**7.** Section L.17 of the Consent Decree provides in relevant part:

> The parties intend the provisions set forth herein to govern future IBT practices in those areas. To the extent the IBT wishes to make any changes, constitutional or otherwise, in those provisions, the IBT shall give prior written notice to the plaintiff.... If the plaintiff then objects to the proposed changes as inconsistent with the terms and objectives of this order, the change shall not occur....

*Id.* at 794–95.[8]

### E. Drafting Constitutional Amendments

#### 1. Process of Incorporation

As previously noted, Section D.9(a) of the Consent Decree compels the incorporation of the Consent Decree into the IBT Constitution. To implement this provision, the Government drafted amendments to the IBT Constitution that incorporated provisions of the Consent Decree. (Declaration of Edward T. Ferguson, III ("Ferguson Dec."), ¶ 7 at p. 4); (Declaration of Gary S. Witlen ("Witlen Dec."), ¶¶ 4–6 at pp. 2–4). Any difference between the constitutional provisions that incorporate the Consent Decree and the Consent Decree reflect a desire to make the constitutional provisions "more intelligible to the average union member and official." (Witlen Dec., ¶ 5 at p. 3). All language ultimately incorporated into the 1991 IBT Constitution therefore represents, as the Constitution itself states, "[l]anguage *required* by the Consent Decree." 1991 IBT Constitution, Introduction. Because Section F.12(I) of the Consent Decree provides, in relevant part, that "the parties [cannot] ... modify, change or amend the terms of [the Consent Decree]," the amendments formally incorporating the provisions of the Consent Decree into the 1991 IBT Constitution could not limit or expand those provisions.

#### 2. Section G and the IBT's Proposed Ethical Practices Committee

In order to ensure compliance with Section D.9(b) of the Consent Decree, the Government drafted language to incorporate Paragraph G of the Consent Decree into the IBT Constitution. (Ferguson Dec., ¶ 11 at p. 6); (Witlen Dec., ¶ 13 at pp. 7–8). This language was ultimately incorporated into the IBT Constitution at Article XIX, Section 14. Prior to the IBT Convention, however, the IBT proposed to establish an Ethical Practices Committee in lieu of the IRB. *See* 1991 IBT Constitution, Art. XIX, § 14(a) (language adopted by delegates but

disapproved by Government); (Ferguson Dec., ¶ 10 at p. 5 (IBT proposed to establish an Ethical Practices Committee)); (Witlen Dec., ¶ 11 at p. 6 (Ethical Practices Committee as substitute for the Independent Review Board)). The IBT proposal called for the establishment of an Ethical Practices Committee, composed of five members recommended by IBT Area Conferences, which would assume some IRB powers. The Government vetoed the IBT amendment proposing the Ethical Practices Committee "[b]ecause the provisions in the IBT proposal radically altered both the composition and authority of the entity established by the Consent Decree." (Ferguson Dec., ¶ 10 at p. 6); *see* (Witlen Dec., ¶ 13 at pp. 7–8).

### F. The Instant Application

On July 17, 1992, the Government brought this application pursuant to Section K.16 of the Consent Decree. The application seeks an order approving proposed rules and procedures for operation of the IRB. The proposed rules are intended to govern the operation of the IRB, its members, and its staff. This Court scheduled a hearing for July 30, 1992, and received pre-hearing submissions from the Government, the IBT, and Frederick B. Lacey. At the July 30, 1992 hearing, this Court heard argument on the Government's application.

## II. DISCUSSION

The Government contends that its proposed rules are necessary for the IRB to operate effectively and efficiently, and therefore, its rules are necessary to implement the express terms of the Consent Decree. In addition, the Government asserts that promulgation of its proposed rules now will permit the IRB to be a viable entity on the day it begins operations. Deciding the scope of the IRB's authority and other issues involving the IRB on an *ad hoc* basis will allegedly sty-

---

**8.** In addition, this Court issued a calendaring order for the IBT Convention providing that in the event of a dispute that threatened the implementation of the Consent Decree, the parties or the Independent Administrator could suspend the proceedings until this Court resolved the matter.

mie its effectiveness for the foreseeable future. The Government's proposed rules are drawn from the terms of the Consent Decree and the IBT Constitution as amended at the IBT Convention.

The IBT proffers three sets of arguments in opposition to the Government's application. The first set concerns the language and the purpose of the Consent Decree. The IBT argues that: (1) the Government's application is not proper because the Consent Decree authorizes the IRB, not the Government, to promulgate rules for IRB operation; (2) the adoption of any rule for IRB operation, regardless of its content, is an impermissible alteration of the parties' agreement; and (3) the adoption of any rule for IRB operation, regardless of its content, is inconsistent with the purpose and structure of the Consent Decree. The second set of arguments is not based on the express provisions of the Consent Decree, but rather on a farrago of legal principles and policy considerations. The IBT argues that: (1) the Government waived its right to promulgate its proposed rules when, in the process of incorporating the Consent Decree into the IBT Constitution, it failed to raise the issues in this application; (2) the adoption of rules for IRB operation violates a federal labor policy favoring government non-intervention in union affairs; (3) the democratic election of a new IBT administration dedicated to eradicating corruption obviates the need for the Government's proposed rules; and (4) the proposed rules impose excessive monetary costs on the IBT. The third set of arguments attacks the individual rules based on their content.

From the day the parties entered the Consent Decree, March 14, 1989, until today, the IBT has waged a zealous legal attack on the reforms contained in that agreement. After agreeing that it was "imperative" to eradicate corruption from the IBT and restore democratic practices to the Union, the prior IBT administration spent $10.5 million on a campaign to eviscerate the mechanisms contained in the Consent Decree to achieve these goals. The prior IBT administration repeatedly challenged the scope of the Court-Appointed Officers' authority, and in these challenges, sought to limit their power, stymie their efforts, and delay the implementation of any reform. It argued primarily that principles of contract interpretation and union autonomy required a restrictive interpretation of the Consent Decree. Interpreting the language of the Consent Decree in light of its express purposes, and recognizing that the Consent Decree is an agent and not an opponent of union autonomy, this Court and the Court of Appeals consistently rebuffed the IBT's attempts to enervate the provisions of the Consent Decree. The Court–Appointed Officers' authority is drawing to a close; their efforts led to the democratic election of the current IBT administration, which has begun to shape the future of this Union. While the new administration publicly has disassociated itself from its predecessors' attempts to thwart reform, it has adopted its litigation strategy with respect to both the Court–Appointed Officers and the IRB.

### A. Consent Decree Law

■ Consent Decrees are hybrid instruments, containing traits of both contracts and judicial decrees. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 935 n. 10, 43 L.Ed.2d 148 (1975). Nevertheless, because consent decrees "have many attributes of ordinary contracts, they should be construed basically as contracts." *Id.* at 236–37, 95 S.Ct. at 934. Applying principles of contract interpretation to consent decrees implies that a consent decree's "meaning is ordinarily to be discerned within the 'four corners' of the decree." *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 38 (2d Cir.1989). A court must not "expand or contract the agreement of the parties as set forth in the consent decree." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir.1985). It follows, then, that "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). In other

words, when resolving disputed language in a consent decree, the decree "should be interpreted in a way that gives effect to what the parties have agreed to, as reflected in the judgment itself." *SEC v. Levine*, 881 F.2d 1165, 1179 (2d Cir.1989).

■ As with any other contract, "reliance upon certain aids to construction is proper." *ITT Continental Baking*, 420 U.S. at 238, 95 S.Ct. at 935. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning the parties accorded to certain words, and any other documents expressly incorporated in the decree. *Id.* In *ITT Continental Baking*, the Court expressly confirmed that "[w]here parties in one agreement include both a consent order and *an explanation of the order*, and also provide that the complaint is to be used to construe the order, it seems logical to conclude that, at least as to interpretations not precluded by the words of the order itself, the collateral documents can and should be used to give meaning to the words of the order." *Id.* at 239 n. 12, 95 S.Ct. at 935 n. 12 (emphasis added).

In this action, the Consent Decree contains its own explanation. The IBT recognized that "there have been allegations, sworn testimony and judicial findings of past problems with La Cosa Nosa corruption of various elements of the IBT." Consent Decree, at p. 2 (fourth Whereas Clause). As a result, the parties expressly agreed that "there should be no criminal element or La Cosa Nostra corruption of any part of the IBT." *Id.* (fifth Whereas clause). In addition, the parties agreed that "it is imperative that the IBT, as the largest trade union in the free world, be maintained democratically, with integrity and for the sole benefit of its members without unlawful outside influence." *Id.* (sixth Whereas clause).

### B. Prior Interpretations of the Consent Decree

During the life of this Consent Decree, the Government and the IBT repeatedly have offered conflicting interpretations of the agreement that required resolution by this Court. In resolving these disputes, this Court has always looked to the four corners of the document with the view that "[t]he spirit ... of this Consent Decree command[s] that its specific language be given the most reasonable interpretation possible." October 18, 1989 Opinion & Order, 723 F.Supp. 203, 210 (S.D.N.Y.1989), *aff'd*, 931 F.2d 177 (2d Cir.1991); *see, e.g., SEC v. Levine*, 881 F.2d 1165, 1179 (2d Cir.1989); *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 38 (2d Cir.1989).[9] The principles animating any reasonable interpretation of the Consent Decree are found in the document: by entering this compact, the parties committed to rid the IBT of La Cosa Nostra influence and corruption, and to maintain the IBT "democratically, with integrity and for the sole benefit of its members." Consent Decree, at p. 2 (fifth & sixth Whereas clauses); *c.f. ITT Continental Baking Co.*, 420 U.S. at 239 n. 12, 95 S.Ct. at 935 n. 12.

In recognition of the vital purposes underlying the Consent Decree, this Court and the Second Circuit consistently have rejected restrictive and narrow interpretations of the Consent Decree that would thwart implementation of the parties' agreement. *See, e.g.,* May 6, 1991 Opinion & Order, 764 F.Supp. 787, 794–95 (S.D.N.Y.) (rejecting IBT's argument that it could "vote out" the Consent Decree as contrary to its language and purpose), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.) (rejecting "unfettered power" of IBT officers to interpret IBT Constitution, which could "allow them to frustrate the implementation of the Consent Decree"), *aff'd*, 905 F.2d 610 (2d Cir.1990); February 27, 1990 Memorandum & Order, 735 F.Supp. 502, 504 (S.D.N.Y.) (despite absence of express provision, "spirit and intent of the Consent Decree ... strongly favors informing the

---

**9.** The Consent Decree recognizes that nothing contained in it "shall be construed as authorizing the parties or the Court-appointed officers to modify, change or amend the terms of the Order." Consent Decree, § F.12(I).

rank-and-file of which IBT members are facing charges"), *aff'd*, 907 F.2d 277 (2d Cir.1990); November 2, 1989 Memorandum & Order, 725 F.Supp. 162, 166 (S.D.N.Y. 1989) (interpreting scope of Investigations Officer's power in light of language and purpose of Consent Decree, and intent of parties, and concluding that Investigations Officer could pursue charges against convicted felons); October 18, 1989 Opinion & Order, 723 F.Supp. 203, 206 (S.D.N.Y.1989) (rejecting IBT's restrictive interpretation of Election Officer's authority to "supervise" IBT electoral process, and instead, giving term "supervise" its most expansive and active meaning), *aff'd*, 931 F.2d 177 (2d Cir.1991).

For example, the Second Circuit affirmed a decision by this Court that allowed the Election Officer to promulgate Election Rules. *See United States v. IBT,* 931 F.2d 177 (2d Cir.1991). In so doing, the Second Circuit rejected the IBT's restrictive reading of the provisions of the Consent Decree. Among the many Election Rules to which the IBT objected was one that allowed the Election Officer to publish information in the *International Teamster* magazine. The IBT averred that such a rule "rewrote" the Consent Decree because while the Consent Decree expressly gave this authority to the Independent Administrator, it did not expressly grant this authority to the Election Officer. In rejecting the IBT's position, the Second Circuit stated that:

> The fact that the parties specifically foresaw that the [Independent] Administrator would need to publish reports in the magazine does not foreclose the Election Officer and district court from determining in the course of events that use of the magazine is also necessary to ensure an effective rank-and-file election.

*Id.* at 187.

C. *Promulgation of Rules for IRB Operation Is Consistent with the Language and Purpose of the Consent Decree and the Intent of the Parties*

 1. The Government's Application is Proper

■ The Government has brought this application pursuant to Section K.16 of the

Consent Decree, which provides that "[t]his Court shall retain jurisdiction ... to entertain any future applications by ... the parties." The power of the parties to bring an application before this Court is well settled. Section K.16 permits an application based upon any issue—including a prospective matter—that touches upon a provision of the Consent Decree. Indeed, this Court has held that "[t]he scope of [Section] K.16 is broad enough to warrant the court to consider prospective matters that may threaten the letter, spirit and intent of this Decree." May 6, 1991 Opinion & Order, 764 F.Supp. 787, 791 (S.D.N.Y.), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991).

The Government, a party to this action, has brought this application requesting that this Court address an issue that threatens the viability and effectiveness of the IRB, and thus imperils the implementation of a key section of the Consent Decree. Resolution of this application requires an interpretation and analysis of the Consent Decree—its language and purpose, as well as the parties' intent—in order to assess the need for rules and the reasonableness of the proposed rules. As a party to this action seeking to address an issue that directly implicates the language and purpose of the Consent Decree, the Government has authority to bring this application under Section K.16 of the Consent Decree.

The IBT nonetheless argues that the Government has no authority to bring this application because the IBT Constitution supposedly gives the IRB exclusive authority to promulgate rules covering any aspect of IRB operation. The IBT supports this argument by citing Article XIX, Section 14(c)(3) of the IBT Constitution, which provides that disciplinary hearings "shall be conducted under rules and procedures, generally applicable to labor arbitration hearings, to be established by the Review Board." The phrase referring to the IRB's authority to promulgate rules for the conduct of disciplinary hearings is not found in the corresponding provision of the Consent

Decree, which provides that disciplinary hearings "shall be conducted under the rules and procedures generally applicable to labor arbitration hearings." Consent Decree, § G(i).

The IBT's interpretation of Section 14(c)(3) contradicts the clear and unambiguous language of that section. Section 14(c)(3) plainly authorizes the IRB to promulgate rules governing the conduct of its disciplinary hearings that comport with rules generally applicable to labor arbitration hearings. It is equally apparent, however, that Section 14(c)(3) does not vest the IRB with exclusive authority to promulgate rules for all aspects of IRB operation. Similarly, no other section of the Consent Decree or the IBT Constitution gives the IRB such exclusive rule-making authority or in any way limits the parties' ability to bring an application seeking to promulgate such rules. It is worth noting that while the IBT consistently seeks to impose a narrow, restrictive interpretation on the language of the Consent Decree and the IBT Constitution, in this argument it is content to endow the IRB with an exclusive grant of rule-making authority that is far in excess of that contained in either the Consent Decree or the IBT Constitution.

2. The IRB as Revealed through the Language and Purpose of the Consent Decree and the Intent of the Parties

Not only does the Government have authority to bring this application, but the application involves a matter central to the Consent Decree. The IRB is a permanent institution vested with power to investigate and eradicate corruption, and to monitor the IBT's attempts to eradicate corruption. As such, it is instrumental in realizing the goals of the Consent Decree. The opening paragraphs of the Consent Decree recognize the influence of organized crime in the IBT, and emphatically state that this repugnant influence should be eradicated. Consent Decree, at p. 2 (fourth & fifth Whereas clauses). In addition, the parties agreed that it was "imperative" to maintain the Union "democratically and with integrity for the sole benefit of the membership." *Id.* (sixth Whereas clause). During their tenure, the Court–Appointed Officers have worked to realize these goals. By seeking out and remedying corruption, they have created an atmosphere hospitable to democratic practices. While eliminating entrenched corruption, they also have acted as a constant check on any individual or entity that desired to use the IBT as a vehicle for lawlessness, as so many had done successfully in the past.

While the terms of office of the Independent Administrator and the Investigations Officer will soon terminate, the goals they strive to realize remain in place. The parties prepared for this moment by agreeing to the establishment of the IRB, which will continue the Independent Administrator's and Investigations Officer's efforts to eradicate corruption in this Union. The IRB will be the only independent entity with the disciplinary authority to promote the purposes of the Consent Decree. Although the Consent Decree and the IBT Constitution do not expressly provide a date for when the IRB will begin to exercise its authority, several provisions of the Consent Decree reveal that the IRB must commence functioning no earlier than the certification of the 1991 election, and no later than October 10, 1992.[10] The IRB must then

---

**10.** The IRB's time to begin operating is intimately connected with the termination of the terms of office of the Independent Administrator and the Investigations Officer. It is clear that the authority of the Investigations Officer and the Independent Administrator did not terminate after the certification of the 1991 election results. Section B.3(3) of the Consent Decree provides that these Court–Appointed Officers may continue to exercise their authority under the Consent Decree until "nine (9) months after the certification of the 1991 election results," or October 10, 1992. In addition, Section B.3(2) provides that the Independent Administrator may "resolve to completion and decide all charges filed by the Investigations Officer on or before [this] date." Thus, the Investigations Officer continues to function until October 10, 1992, and the Independent Administrator may function for an even longer period of time.

The IRB could begin to operate anywhere in the time between the certification of the 1991 election and October 10, 1992. This is clear from a reading of § G, which provides that following the certification of the 1991 election, the "Investigations Officer and the Independent Administrator shall continue to exercise the[ir]

begin to function so that at all times some independent entity exercises investigatory and disciplinary power.

In agreeing to establish the IRB, the parties recognized that the crucial goal of eradicating corruption does not occur over night, but rather occurs only with perpetual vigilance. Indeed, unlike the duration of the Court–Appointed Officers's authority, there is no timetable for the completion of the IRB's task. The IRB will act as a constant foe of corruption and a vigilant agent of union democracy. The transfer of authority from the Court–Appointed Officers to the IRB also heralds a change in the IBT's role in the investigatory and disciplinary process under the Consent Decree. Where the Court–Appointed Officers performed their tasks without IBT involvement, the Consent Decree envisions a disciplinary process characterized by IBT and IRB interaction. This change, however, does not alter the purposes of the Consent Decree and the IRB's role in achieving these goals.

■ The IRB is to carry out its mandate in both a cooperative environment created by an IBT administration truly dedicated to reform and a hostile environment created by an IBT administration dedicated to thwarting reform. Accordingly, regardless of a particular administration's stance toward reform, the IRB will serve as a perpetual agent of those reforms—independent of the parties, vigilant in the fight against corruption, and stalwart in the promotion of union democracy. An expanded role for the IBT in the disciplinary and investigatory processes, therefore, does not imply that the IRB is meant to be an enervated entity that is all but unworkable in practice. Just as the Consent Decree gives the IBT a part to play in this process, other express provisions call for the IRB to continue the work of attempting to eliminate

corruption from this Union. This is not a zero sum game; the increase in the IBT's role does not result in a corresponding decrease in the IRB's place under the Consent Decree. Instead, both are charged in this new phase of the Consent Decree with working to rid this Union of corruption. Neither is meant to be weak, and both are meant to attack this task with ardor and zeal. No matter what stance an IBT administration takes, the IRB's presence ensures that the hard-working rank-and-file of this Union always will have an ally dedicated solely to serving their interest in a union free from mafia influence and corruption.

### 3. Absence of Rules Threatens the IRB's Ability to Fulfill its Crucial Role Under the Consent Decree

■ Without rules for IRB operation, the IRB will not be able to operate, let alone realize these goals. Section G of the Consent Decree, as well as Article XIX, Section 14 of the IBT Constitution, address IRB operation in skeletal fashion. While the Consent Decree and the IBT Constitution contain provisions on a range of topics—including staffing, office space, funding, and the IRB's investigatory and disciplinary powers—the coverage lacks sufficient detail to allow the IRB to function at all, let alone in an effective and efficient manner. Indeed, at the July 30, 1992 hearing, the IBT conceded the need for rules to flesh out the express provisions of the Consent Decree. (Transcript of July 30, 1992 Hearing at pp. 78, 80–82).

This Opinion's discussion of the individual rules reveals that the provisions of the Consent Decree and the IBT Constitution, standing alone, are insufficient to allow the IRB to discharge its mandate. *See infra* pp. 790–99. Rule E(1), which creates the

---

investigatory and disciplinary authority" until October 10, 1992, except that they may "refer any such investigation or disciplinary matter to the [IRB]." This provision reveals that following the certification of the 1991 election, the IRB on the one hand, and the Investigation Officer and the Independent Administrator on the other, each have authority to address investigations and disciplinary matters. Because the

Investigations Officer's term terminates on October 10, 1992, however, the IRB must at the latest begin to operate on this date. Thus, although not expressly stated, these provisions demonstrate that the parties intended the IRB to commence functioning no earlier than the certification of the 1991 election, and no later than October 10, 1992.

position of "Chief Investigator," illustrates this point. The Consent Decree vests the IRB with the same "investigatory authority as the General President and the General–Secretary Treasurer." Consent Decree, § G(b). Moreover, the Consent Decree expressly provides that the IRB "shall be authorized to hire a sufficient staff of investigators and attorneys to investigate" corruption. *Id.*, § G(a). As well as exercising its investigatory authority, the IRB must also preside at fair and impartial disciplinary hearings resulting from its investigations. *Id.*, § G(g). Although the Consent Decree does not specifically provide for a "Chief Investigator," a rule providing for a Chief Investigator is both a reasonable interpretation of the language of the Consent Decree and absolutely essential to the IRB's ability to exercise its authority under the Consent Decree.

The IRB must investigate corruption throughout the IBT, which is comprised of the International Union, Area Conferences, Joint Councils, Trade Divisions, Trade Conferences, State Conferences, over 600 Local Unions, and 1.5 million members. The IRB itself could not possibly coordinate and conduct each investigation on its own, while at the same time carrying out its other tasks under the Consent Decree. Investigations are complicated endeavors that entail countless separate and distinct tasks. The IRB not only has to initiate investigations, but also must engage in an interactive disciplinary process with the IBT while monitoring IBT efforts to implement IRB recommendations. *See* Consent Decree, §§ G(b)–(g), (i) & (j). In addition, the disciplinary process culminates in a hearing, in which the IRB must act as a fair and impartial adjudicator. *Id.*, § G(h). Moreover, the IRB must review all IBT disciplinary decisions, *Id.*, § G(k), which is a herculean undertaking if an IBT administration is dedicated to reform.

It is simply inconceivable that the IRB alone could effectively discharge these sundry duties while having to coordinate—on its own in each case—all investigatory functions. Furthermore, without a Chief Investigator, the IRB would also have to adopt a prosecutorial stance at disciplinary hearings by presenting charges that it would then have to adjudicate fairly and impartially. The IRB's adoption of such conflicting postures violates the Consent Decree's clear mandate that the IRB conduct fair and impartial hearings. Accordingly, a rule creating a Chief Investigator who can coordinate investigations and present charges is absolutely essential to the IRB's ability to function as agreed to by the parties.

The need to appoint a Chief Investigator is apparent. The need to create rules that enable the IRB to function, however, exists in many other areas of IRB operation. This situation is particularly ominous given that while the IRB must begin to function by October 10, 1992, it could have begun functioning almost seven months ago. That it required these seven months just to appoint the third member of the Board reflects the need for prompt promulgation of Rules if the IRB is to be a functioning entity on October 10, 1992. Moreover, advance promulgation of these Rules affects not only the IRB's viability on October 10, 1992, but its effectiveness after that date. Failing to promulgate Rules for IRB operation compels *ad hoc* resolution of disputes involving the IRB. Given that the IBT objects to each of the Government's proposed rules that does not incorporate provisions of the Consent Decree in *haec verbae*, resolution of issues on an *ad hoc* basis will entail a massive number of separate litigations. Given the experience of the Court–Appointed Officers, such litigation will undoubtedly delay and hamper the IRB's performance of its duties, and also reduce the time and energy IRB members can devote to their assigned tasks.

In order to implement the express provisions of the Consent Decree that call not only for a workable IRB by October 10, 1992 and thereafter, but one that is able to realize the goals of the Consent Decree, it is reasonable and necessary to promulgate Rules for the operation of the IRB. *See* October 18, 1989 Opinion & Order, 723 F.Supp. 203, 210 (S.D.N.Y.1989) ("The spirit and intention of this Consent Decree command that its specific language be giv-

en the most reasonable interpretation possible"), *aff'd*, 931 F.2d 177 (2d Cir.1991); *see, e.g., SEC v. Levine*, 881 F.2d 1165, 1179 (2d Cir.1989) (consent decrees "should be interpreted in a way that gives effect to what the parties have agreed to, as reflected in the judgment itself."). The IRB's importance in the scheme of the Consent Decree, and the absence of detailed rules that would allow it to operate effectively and efficiently, make the promulgation of Rules governing the operation of the IRB an urgent and vital matter. Doing so now, rather than at some future time after the IRB has attempted to carry out its mandate, will help ensure that from the moment it comes into existence as an operating entity, the IRB will be able to perform the task, agreed upon by the parties, of eradicating corruption in the IBT. *See, e.g., ITT Continental Baking*, 420 U.S. at 239 n. 12, 95 S.Ct. at 935 n. 12 (consent decree must be interpreted in light of its express purpose).

### D. Promulgation of Rules Is Consistent with Other Proffered Principles and Policies

■ The propriety of the Government's application and the validity of its proposed rules turns on interpretation of the Consent Decree. The IBT even acknowledges that interpretation of the Consent Decree is dispositive of the Government's application. While it consistently urges this Court to focus exclusively on the language and purpose of the Consent Decree, the IBT also makes a number of arguments wholly unrelated to the interpretation of that document. Although these arguments are irrelevant to the resolution of this application, this Court will address them to dispel any notion that they undermine the propriety of promulgating rules for IRB operation.

### 1. The Government Did Not Waive Its Right to Bring this Application

■ The IBT argues that the Government waived its right to make this application

tion when, in the process of incorporating the Consent Decree into the 1991 IBT Constitution at the IBT Convention, the Government did not raise the issues now presented.[11] The IBT's argument lacks merit. While throughout its papers, the IBT argues that the Consent Decree encompasses the complete, clear and unambiguous agreement of the parties, it now urges an interpretation of the Consent Decree based upon parol evidence. Though the inconsistency seems to elude the IBT, using parol evidence to interpret the Consent Decree's provisions undermines the IBT's claims that these provisions are clear and unambiguous. As discussed above, resolution of the issues presented in this application is possible from within the four corners of the Consent Decree and without resort to parol evidence.

Even if relevant, the parol evidence in question reveals that the Government did not waive its right to bring this application when it participated in the incorporation process at the IBT Convention.[12] The Consent Decree not only amended the IBT Constitution, but also required that the IBT "formally" vote to amend the IBT Constitution—and thus incorporate the Consent Decree—by no later than the conclusion of the 1991 IBT Convention. Consent Decree, § D.9(b); *see* May 6, 1991 Opinion & Order, 764 F.Supp. 787 (S.D.N.Y.), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991). In order to comply with this requirement, Gary S. Witlen, then-IBT Associate General Counsel, and Edward T. Ferguson, then an Assistant United States Attorney, discussed the incorporation of the Consent Decree into the IBT Constitution and drafted constitutional amendments to accomplish this task. (Ferguson Dec., ¶ 7, at p. 4); (Witlen Dec., ¶¶ 4–6 & 9 at pp. 2–5). Because during these discussions and drafting sessions the Government never raised the issues presented in this application, the IBT argues that the Government

---

**11.** For a discussion of the incorporation process, see *supra* p. 776.

**12.** Indeed, this Court invited the IBT to submit a supplemental brief to support this theory. The

IBT submitted a brief. Instead of discussing the waiver issue, however, it focused on the language and structure of the Consent Decree.

waived its right to make this application and propose rules.

This argument ignores the focus of Mr. Witlen's and Mr. Ferguson's discussions at the IBT Convention. Mr. Witlen and Mr. Ferguson discussed how to incorporate the provisions of the Consent Decree into the IBT Constitution, as required by the Consent Decree, so that the language would be more intelligible to the membership and would neither expand nor contract the parties' agreement. (Ferguson Dec., ¶ 7 at p. 7); (Witlen Dec., ¶ 5 at p. 3). The Government incorporated Section G of the Consent Decree by drafting what became Article XIX, Section 14 of the IBT Constitution.

The Government and the IBT discussed IRB operation only to the extent necessary to incorporate Section G of the Consent Decree into the IBT Constitution. (Ferguson Dec., ¶ 12 at p. 6). The amendments did not purport to "interpret or implement" provisions of the Consent Decree. *Id.*, ¶ 8 at p. 5. Nor did the parties intend "to resolve all questions or issues concerning the administration and operations of the IRB or other aspects of section G of the Consent Decree." *Id.* Quite simply, discussions surrounding the constitutionalization process are wholly unrelated to the substantive issues concerning IRB administration and operation.

### 2. Federal Labor Policy Favors Promulgation of These Rules

■ The IBT contends that a "longstanding policy against intervention in the internal affairs of unions" compels a strict interpretation of the provisions of the Consent Decree governing IRB operation. *Newman v. Local 1101, Communications Workers*, 570 F.2d 439, 446 (2d Cir.1978). Moreover, the IBT argues that the proposed rules are unreasonable because they allow unnecessary government intervention in union affairs. These arguments lack merit because the parties agreed to the presence of the IRB, the IRB operates in a limited sphere of IBT affairs, and the IRB is not even a Government entity.

In order to avoid the possible consequences of losing at trial, the IBT expressly agreed to the IRB along with other reform measures when it signed the Consent Decree. The presence of a viable IRB, therefore, does not infringe upon IBT autonomy to an extent greater than that contemplated by the parties. Moreover, federal policy favoring non-interference in union affairs does not constitute a license for this Court to distort the language of the Consent Decree by allowing the IBT to avoid its express obligations.

The parties allowed the IRB to exercise certain investigatory and disciplinary powers, and to review the IBT's attempts to discipline corrupt elements in the Union. The IRB has no role in the day-to-day affairs of the IBT. Even in the IRB's sphere of operation, it does not wrest investigative and disciplinary authority from the IBT because the IBT can independently initiate investigatory efforts. The IRB merely augments the IBT's ability to eradicate corruption from the Union. In fact, the degree of IRB activity in the disciplinary process is directly related to the IBT's anti-corruption efforts. Under the Consent Decree's disciplinary scheme, IRB action is required less frequently if the IBT is truly committed to attacking corruption in its midst. If the IBT's commitment waivers, if its courage flags, if it simply reverts to past IBT practices, the IRB will ensure the membership a vigilant agent in the fight against corruption.

In addition, while federal labor policy frowns upon government intervention in union activities, the IRB is not a government-affiliated entity. As its moniker suggests, the IRB is an "independent" body whose existence, functions and composition are creatures of the parties' agreement. Pursuant to the Rules, members and staff of the IRB may not simultaneously maintain Government employment. Under the Consent Decree, the Government's sole attachment to the IRB is that the Attorney General of the United States appoints one of its members.

The IBT's assertion of union autonomy in an attempt to restrict IRB operation rests on a perverted notion of the virtues of an autonomous union. Moreover, the IBT's

desire to realize union autonomy, at the expense of any other objective, represents a warped vision of union leadership. The IBT invokes the doctrine of "union autonomy" as a shibboleth of a union leadership dedicated to the interests of the membership. Such blind invocation of that doctrine, however, ignores that union autonomy is a virtue if the union is run for the benefit of the membership, but a vice if it protects corrupt union leaders who foster an environment of fear and intimidation.

As a general principle, this Court acknowledges the value of government noninterference in union affairs. The value of such autonomy, however, lies in the benefits that accrue to the membership: "General supervision of unions by the courts would not contribute to the betterment of the unions or their members or the course of labor-management relations." *Gurton v. Arons*, 339 F.2d 371, 375 (2d Cir.1964). An implicit assumption underlying the value of union autonomy is that democratically-elected officials—and not some outside force—can best represent the interests of the membership that elected them. *See id.* Officials elected in an autonomous but undemocratic union—where dissident candidates cannot in practice win election—have little impetus to serve the membership's interests. To be a virtue, union autonomy assumes the existence of a democratic union run with integrity and for the benefit of the membership. Thus, union autonomy is a worthy goal if the rank-and-file can actively participate in and freely discuss all aspects of union affairs without fear of psychological, physical or economic retaliation.

In a union riddled with the influence of organized crime and other corrupt forces, union autonomy shields corrupt leaders and nurtures an environment of fear and intimidation that is incompatible with democratic reform. By investigating and disciplining corruption, the IRB will preserve an atmosphere in which the rank-and-file can exercise its rights to self-governance. In performing this task, the IRB acts as an agent of democratic reform and creates an atmosphere where union autonomy is in the membership's interests.

Thus, the IBT's attempt to restrict the operation of the IRB, an agent of democratic reform and union autonomy—in the name of union autonomy—is perverse. Moreover, the IBT's willingness to realize union autonomy at the expense of democratic reform represents a willingness to disenfranchise the membership in order to consolidate power in the hands of a few. As such, the IBT's opposition to the proposed rules suggests a desire not to return the Union to its members, but to cloak corruption in secrecy and to keep the rank-and-file shrouded in fear of retaliation for the expression of ideas or the criticism of incumbents.

The IRB does not insult the federal labor policy favoring government non-intervention in union affairs. Similarly, rules that simply enable the IRB to carry out its mandate are no more intrusive than the existence of the IRB itself. The IBT's arguments to the contrary misconstrue the parties' agreement, the nature of the IRB, the IRB's and IBT's roles in the disciplinary process, and the value of union autonomy.

3. The Current IBT Administration's Stance Toward Reform Does Not Affect the Propriety of These Rules

The current IBT administration claims that having won the first democratic election in IBT history, it has earned the privilege to eradicate corruption without close supervision. To support this argument, the IBT cites the new administration's commitment to eradicate corruption within the Union. *See* (Declaration of Ronald C. Carey ("Carey Dec."), ¶ 34 at p. 20 ("The Government should acknowledge the[ ] dramatic changes in our Union and the commitment of my administration to honest trade unionism; it should not seek to restrict our ability to manage our own affairs....")). In addition, the IBT argues that the Union has already "changed," implying that there is no need for an independent body to eradicate corruption. *Id.*, ¶¶ 34–35 at p. 19 ("In less than six months, the IBT has been transformed into a labor union run by and for its members....

[T]imes have changed; this union has changed."). This argument is both irrelevant and duplicitous.

The argument is irrelevant because disposition of this application turns on interpretation of the Consent Decree. Regardless of this administration's attitude toward reform, the Consent Decree gives the IRB both the power to eradicate corruption on its own initiative and to monitor the IBT's attempt to eradicate corruption. *See* Consent Decree, §§ G(b)–(k); *supra* pp. 780–81. Failure to promulgate rules enabling the IRB to perform these tasks in reliance on the current administration's assurances would violate the clear mandate of the Consent Decree. Of course, the administration's efforts to eradicate corruption are not wholly irrelevant to the IRB's activity. If this and subsequent administrations are vigilant enemies of corruption, the IRB necessarily will have less need to intervene in the disciplinary process. If, however, this or subsequent IBT administrations choose not to fight corruption vigilantly, the IRB must assume a greater role under the terms of the Consent Decree. *See supra* pp. 780–81. Nevertheless, whatever stance an IBT administration adopts toward reform, these Rules are proper as consistent with the language and purpose of the Consent Decree, which compels the IRB to eradicate corruption in any climate.

The IBT's argument is also misleading. While claiming only the purest intentions, this administration's record on investigating corruption and imposing discipline is pathetic. While the Investigations Officer has filed charges against 185 IBT officers and members over the last three years, the IBT has not filed a single disciplinary charge in over six months since taking office.

The new administration's record on the imposition of trusteeships is not much better. Two separate trusteeship issues are illustrative. One involves Mr. Carey's actions concerning the affairs of Local 295. The Local 295 affair surfaced in June 1991, when the Independent Administrator sustained charges against officers of IBT Local 295 based upon their failure to investi-

gate allegations of extensive mafia involvement in the Local's affairs. *See* November 8, 1991 Memorandum & Order, slip op., 1991 WL 243292 (S.D.N.Y.1991) (seven Local 295 officers breached their duty to the membership by failing to investigate rampant corruption and executed numerous schemes to embezzle Local 295 funds); August 14, 1991 Memorandum & Order, slip op., 1991 WL 161084 (S.D.N.Y.1991) (former President of Local 295 brought reproach upon the IBT by being a member of La Cosa Nostra, embezzling $50,000 of Local 295 funds, and refusing to answer questions posed by the Investigations Officer). The Independent Administrator noted that "[t]hroughout its history, Local 295 has been at the center of a virtual avalanche of criminal activity rooted in organized corruption." Application XLII of the Independent Administrator at p. 45, *aff'd*, November 8, 1991 Memorandum & Order, slip. op., 1991 WL 243292 (S.D.N.Y.1992). Following the Independent Administrator's decision, the Local 295 Executive Board attempted to run a "Special Election" so that they could supervise the selection of their successors. In response, the Independent Administrator brought an application seeking to impose a temporary trusteeship over Local 295, which this Court approved on July 3, 1991. The Independent Administrator then appointed William A. Ferchak, a longtime Local IBT officer, as temporary trustee, and this Court affirmed that decision on September 17, 1991. On January 31, 1992, in a decision unrelated to this case, the United States District Court for the Eastern District of New York entered an order approving the appointment of an independent trustee to oversee Local 295. *See United States v. Local 295*, 784 F.Supp. 15 (E.D.N.Y.1992).

On March 4, 1992 without prior notice to the Independent Administrator, General President Carey announced his intention to replace Mr. Ferchak with William F. Genoese, a New York Local IBT officer. The Independent Administrator agreed to the replacement subject to his investigation of Mr. Genoese's background. Pending such review, the Independent Administrator insisted that Mr. Ferchak continue in his

position in the event of Mr. Genoese's removal. *See* Letter from Frederick B. Lacey, Independent Administrator, to Richard N. Gilberg, General Counsel to the IBT, at p. 4 (May 27, 1992) (on file in the Southern District of New York).

Following the investigation, the Independent Administrator vetoed Mr. Genoese's appointment. The Independent Administrator found that "[n]ot only does Mr. Genoese have no experience in ridding Locals of crime and corruption," but he suffers from a "sad record of inaction in the face of a long history of corruption at [JFK] Airport and the IBT Locals affiliated with the airport, at a time when Mr. Genoese was serving as the Director of the IBT Airline Division." *Id.* at 13. In addition, the Independent Administrator found that Mr. Genoese was "unbelievably oblivious to the allegations of corruption around him." *Id.* at 14. The Independent Administrator also noted a pattern of nepotism in Mr. Genoese's own Local, where Mr. Genoese's son, daughter, and son-in-law were on the payroll. *Id.* at 25–27. Moreover, Mr. Genoese directed payments from Local funds to a personal friend who had not performed any work and Mr. Genoese used a Local employee as his personal chauffeur. *Id.* at 28–31.

Although the Independent Administrator did not suggest that General President Carey was aware of Mr. Genoese's record, an investigation by Mr. Carey prior to the Genoese appointment would have revealed the appointee's "deep failings" as an investigator of corruption. "In short, to make the Genoese appointment was to send the wrong signal to the rank-and-file. It did not exemplify a policy of eradicating either nepotism or corruption from the Union." *Id.* at 35.

Another instance of Mr. Carey's seeming indifference to imposing trusteeships over corrupt Locals involves Local 27. On February 7, 1992, the Investigations Officer recommended that the IBT impose a trusteeship on Local 27 based on an egregious history of corruption. *See* Letter from Charles M. Carberry, Investigations Officer, to Ronald C. Carey, IBT General President, pp. 1–2 (February 7, 1992) (on file in the Southern District of New York). More than a month later, on March 8, 1992, counsel for the IBT informed the Investigations Officer that "the General President has determined not to intercede in the matter of trusteeship proceedings" regarding Local 27. Quarterly Report XII of the Independent Administrator, at p. 30 (June 11, 1992) (quoting Letter from Richard Gilberg, General Counsel to the IBT, to Charles M. Carberry, Investigations Officer (March 18, 1992)).

Based on the history of corruption involving Local 27, the Independent Administrator imposed a temporary trusteeship. Continuing to exhibit grave reluctance to take control of a corrupt Local, the IBT refused to comply with the Independent Administrator's request for a list of candidates for the position of temporary trustee. *Id.* As a result, the Independent Administrator's office informed the IBT that, if the IBT did not come forward with names, the Independent Administrator would be forced to make application to this Court. *Id.* On April 2, 1992, nearly two months after the Investigations Officer's trusteeship recommendation and after a threatened application to this Court, the IBT offered to impose its own trusteeship. *Id.* General President Carey's notice of the imposition of the trusteeship stated that Local 27 presented an "emergency situation." *Id.* at 15.[13]

Upon signing the Consent Decree, the prior IBT administration promised its commitment to reform. That hollow promise gave way to a concerted effort by the IBT to thwart the mechanisms of reform agreed to in the Consent Decree. *See supra* pp. 769–76. From the outset, the IBT

---

**13.** More recently, the IBT has imposed trusteeships on two locals and has instituted a review of charges involving another local. One of the trusteeship decisions came only after the chief executive officer of the Local became the subject of a federal indictment. Moreover, both trusteeship decisions occurred without notice to the Independent Administrator. The IBT has taken the position that the Independent Administrator has no right to review these appointments.

tried to dilute the powers and obstruct the functioning of the Court–Appointed Officers. *Id.* Now the terms of the Court–Appointed Officers' are ending and the IRB is about to begin operation. A new administration has taken office and pledged its commitment to reform. Mr. Carey has promised to demonstrate "to the members of this Union and to the public at large that the Teamsters are able to clean their house and eliminate corruption in their ranks without permanent ... intervention." (Carey Dec., ¶ 20 at p. 13). Such pledges of noble intent are not new.[14] Despite this administration's promise of reform, it boasts an anemic record in attempting to eradicate corruption.

The new IBT administration proudly states that it is willing to "live by" the Consent Decree. (Transcript of July 30, 1992 Hearing, at p. 79). This duplicitous assurance is characteristic of the IBT's historic "commitment" to reform. When the IBT states its willingness to "live by" the Consent Decree, the IBT means it is willing to "live by" its restrictive and myopic interpretation of the Consent Decree. The IBT fails to reveal its willingness bitterly to contest patently reasonable interpretations of the Consent Decree that are necessary to implement the parties' agreement. Indeed, in opposing this application, the IBT has urged a feeble role for the IRB, which is an independent body created by the parties for the sole purpose of eradicating corruption from the Union.

Of course, as previously noted, this administration's commitment to reform is irrelevant to the validity of this application and the propriety of these Rules. The language and purpose of the Consent Decree command the existence of a permanent and viable IRB without reference to the reform efforts of a particular IBT administration. These Rules ensure the IRB's viability and effectiveness; they are an absolutely necessary and inescapable interpretation of the Consent Decree.

#### 4. Cost

The IBT also asserts that an IRB operating under these Rules would be inordinately costly. Its sole support for this argument is the declaration of George C. Casey, a financial and data processing consultant to the IBT. The declaration discusses the IBT's general financial condition and the expenses incurred by the Court–Appointed Officers. The IBT argues for the rejection of the Rules based on the IBT's current fiscal picture and the assumption that the IRB will prove as costly as the Court–Appointed Officers.

This argument is irrelevant to the resolution of the Government's application and also flawed on the merits. The IBT's cost argument is misplaced because it is entirely unrelated to interpretation of the Consent Decree. The Consent Decree states clearly and unambiguously that "[t]he IBT shall pay all costs and expenses of the Independent Review Board and its staff (including all salaries of Review Board members and staff)." Consent Decree, § G(1). This provision plainly requires the IBT to pay all costs incurred by the IRB without imposing a ceiling or referring to the IBT's fiscal condition. These Rules for IRB operation are appropriate because they make the IRB a viable entity that can fulfill its mandate under the Consent Decree. That a viable IRB will incur more costs than an unworkable entity is neither surprising nor beyond the scope of the parties' agreement.

---

**14.** Indeed, the IBT seeks to maintain vestiges of its past. For example, Article VI, Section 10 of the 1991 IBT Constitution provides:

There is hereby created the position of General President Emeritus for life which is to be filled by James R. Hoffa. In addition, anything in this Constitution to the contrary notwithstanding, James R. Hoffa is hereby granted, conferred and guaranteed good standing membership in his Local Union and the International Union for the rest of his lifetime, for all purposes, and with all rights and privileges appertaining to such membership as with any other member in good standing without distinction or discrimination upon the payment of the established dues.

He shall receive no remuneration or compensation as President Emeritus. The position of General President Emeritus shall not be considered a constitutional office, but rather a specific honor conferred upon James R. Hoffa in appreciation of his many years of devoted and tireless service to the interests of the International Brotherhood of Teamsters and its members.

The IBT's analogy between the IRB and the Court–Appointed Officers is incorrect, and the suggestion that the Court–Appointed Officers incurred unreasonable costs is simply misleading. The IBT contends that implementation of the Consent Decree has cost the IBT over $35 million.[15] The IBT fails, however, to explain fully the components of this seemingly large figure. The IBT admits that only $24.5 million is attributable to the Court–Appointed Officers. (IBT Memorandum of Law, at p. 22). The remaining $10.5 million was spent on litigation and other efforts designed to frustrate the implementation of the Consent Decree and the work of the Court–Appointed Officers. Of the $24.5 million the IBT attributes to the Court–Appointed Officers, $11.8 million relates to the expenses of the Election Officer, *id.* at 16, whose work concluded with the 1991 IBT election and whose costs are thus irrelevant to estimating the IRB's expenses.

Even assuming that the work of the Independent Administrator and the Investigations Officer consumed the remaining $12.7 million, the IBT fails to offset this amount with the savings achieved by the Court–Appointed Officers. The Independent Administrator's expenditure and contract review efforts have resulted in saving or recovering $14,376,767 for the IBT. (Declaration of John J. Cronin, Jr. ("Cronin Dec."), at p. 2). For example, the Independent Administrator found that the IBT's rigged-bidding arrangement with Windsor Graphics to print the *International Teamster* magazine constituted and furthered an act of racketeering. *See* June 18, 1991 Memorandum & Order, 765 F.Supp. 1206 (S.D.N.Y.1991) (affirming Independent Administrator's decision finding that the General President and his assistant violated their fiduciary duty to use the IBT's money for the sole benefit of the membership), *appeal dismissed*, 91–6182, slip op., 1991 WL 346072 (2d Cir. Sept. 17, 1991). The Independent Administrator's veto of that contract saved the IBT $1.4 million. In addition, the Independent Administrator's October 11, 1990 veto of a proposed loan by

the IBT to the Western Conference of Teamsters—based on a finding that the transaction would constitute and further an act of racketeering activity—saved the IBT over $6 million. The IBT's calculation also fails to account for the approximately $1,222,186 reimbursed to various IBT Locals due to the efforts of the Investigations Officer. Moreover, while the IBT cites the Carey administration's cost savings measures, (IBT Memorandum of Law, at pp. 20–23), the IBT fails to reveal that most of these measures are based on the Independent Administrator's recommendations. (Cronin Dec. at p. 1).

Of course, the IBT's cost objections ring hollow, given its willingness to spend, by its own estimate, $10.5 million fighting the work of the Court–Appointed Officers on an *ad hoc* basis. *See* July 10, 1990 Opinion & Order, 742 F.Supp. 94, 106–07 (S.D.N.Y. 1990) ("Hue and cry about the costs of [the Election Officer's] supervision is disingenuous, since it disregards the cost effectiveness of reform ... [and] ignore[s] the costs [incurred] by the IBT in expensive litigation"), *aff'd*, 931 F.2d 177 (2d Cir.1991). Here, the IBT again cries cost, and yet it again would prefer to litigate issues on an *ad hoc* basis rather than promulgate rules in advance, and thus stem the tide of what will be a torrent of expensive litigation. It seems of little import to the IBT that carrying on the litigation strategy of the past three years will drain the IBT's treasury without a corresponding benefit to the rank-and-file. In addressing this application, the new IBT administration had to choose between funding an agent of reform or financing a campaign to thwart reform; like its predecessors, it would rather pay to fight reform than fund reform.

The IBT fails to realize that although the price of democracy is dear, the cost of its failure to the membership is incalculable. From a purely monetary standpoint, the IRB will make the IBT a more cost-efficient union and recover ill-gotten funds as it fulfills its mandate to eradicate corruption. A purely monetary focus, however, is

---

**15.** For purposes of this discussion, this Court will assume the IBT's figures are correct.

irrelevant; the IBT expressly agreed to pay the IRB's costs without restriction.

## E. The Rules

As previously noted, the IBT argues that the promulgation of any rules is inappropriate regardless of content because it is contrary to the language and purpose of the Consent Decree, and also in conflict with various other legal principles and policies. In the alternative, the IBT argues that a number of the Government's proposed rules are wasteful, inappropriate, and unreasonable. The IBT does not object to most of the Government's proposed rules on these grounds, and thus, seems to concede that these rules are reasonable.

The Rules adopted by this Court incorporate every provision of Section G of the Consent Decree and Article XIX, Section 14 of the IBT Constitution. The Rules adopted by this Court and attached as Exhibit A are reasonable interpretations of the Consent Decree and necessary to implement the provisions of the Consent Decree. *See* October 18, 1989 Opinion & Order, 723 F.Supp. 203, 210 (S.D.N.Y.1989) ("The spirit and intention of this Consent Decree command that its specific language be given the most reasonable interpretation possible."), *aff'd*, 931 F.2d 177 (2d Cir.1991).[16] Moreover, these Rules are necessary to effectuate the express purposes of the Consent Decree and the intent of the parties to eradicate corruption from the IBT and return the Union to the membership.

While the Election Rules were promulgated based on an interpretation of the word "supervise" in the Consent Decree, July 10, 1990 Opinion & Order, 742 F.Supp. 94, 98 (S.D.N.Y.1990), *aff'd*, 931 F.2d 177 (2d Cir.1991), these Rules derive from inter-

pretations of all of the provisions of Section G of the Consent Decree and Article XIX, Section 14 of the IBT Constitution.[17] Nonetheless, the IBT objects to any Rule that does not incorporate provisions of the Consent Decree or IBT Constitution in *haec verbae*. These objections, like a patrin, lead to the unmistakable conclusion that the IBT seeks to enervate the IRB. Certainly, it is odd and unsettling that an administration supposedly dedicated to fighting union corruption would seek to eviscerate an entity created exactly for that purpose. Each IBT objection is without merit. Interpreting the Consent Decree in a way that stymies effective operation of the IRB is patently inconsistent with the language and purpose of the Consent Decree, and the intent of the parties.

### 1. Individual IRB Member Action

■ Several Rules are based on the idea that an individual IRB member may take action without the approval of a majority of the IRB. Rule H(6)[18] provides that "[e]ach member of the IRB shall have the authority to refer matters to the Chief Investigator for investigations in accordance with these Rules." In addition, Rule O provides, in relevant part, that "any member of the IRB may make application to this Court at any time and for any reason that touches upon any aspect of the IRB, including but not limited to the purpose, operation, or authority of the IRB." The IBT objects to any Rule that permits an individual IRB member to act without the express approval of the other IRB members. The IBT's objection is based on its interpretation of Article XIX, Section 14(f) of the 1991 IBT Constitution, which provides that "[a]ll decisions of the IRB

---

**16.** Where necessary, this Court has modified the Government's proposed rules to provide the Consent Decree with its most reasonable interpretation and to implement the express provisions of the Consent Decree. *See, e.g.,* July 10, 1990 Opinion & Order, 742 F.Supp. 94 (S.D.N.Y. 1990) (modifying proposed Election Rules), *aff'd*, 931 F.2d 177 (2d Cir.1991).

**17.** The IBT's challenge to promulgation of the Election Rules is strikingly similar to its challenge to the IRB Rules. In challenging the

Election Rules, the IBT contended that the Election Officer had no authority to formulate proposed rules, and that the proposed rules were unreasonable and beyond the scope of the express terms of the Consent Decree. The IBT has raised identical challenges to the IRB rules.

**18.** The Rule numbers in this Opinion refer to the Rules adopted by this Court, which are attached as exhibit "A," and not the Government's proposed rules.

shall be made by majority vote." [19]

This objection erroneously equates any IRB member "action" with a "decision" on a disciplinary matter. Nothing in the Consent Decree or IBT Constitution suggests, however, that if an IRB member takes "any action," he or she must gain approval from the other members. The term "decision" in the Consent Decree is a term of art that denotes a specific type of IRB action requiring majority vote: the term "decision" applies to those issues requiring a formal ruling. Section G(h) of the Consent Decree, for example, requires that following a disciplinary hearing, "the [IRB] shall issue a written *decision,* which shall be sent to the General President, [the GEB], and all affected parties." Section G(i) provides that "[t]he *decision* of the [IRB] shall be final and binding, and the [GEB] shall take all action which is necessary to implement said *decision.*" Finally, the Consent Decree authorizes the IRB to "take whatever steps are appropriate to ensure proper implementation of any such *decision.*" Consent Decree, § G(j). By using the word "decision," the 1991 IBT Constitution also recognizes that only formal "decisions" of the IRB necessitate majority vote. *See, e.g.,* 1991 IBT Constitution Art. XIX, §§ 14(c)(4)–(5), (e) & (f). Equating any "action" by an IRB member with "decision," therefore, is wholly inconsistent with the plain terms of the Consent Decree and the 1991 IBT Constitution. These documents require a majority vote only for "decisions" and not for all "action."

To support its interpretation, the IBT contends that allowing IRB members to act without a majority vote could lead to individual abuse of power. The IBT contends that if an individual IRB member can unilaterally initiate an investigation, he or she also could conceal an investigation from the other IRB members or proceed with an investigation expressly disapproved by the IRB. These objections are frivolous. Even if two IRB members are unaware of a pending investigation, a "decision" is impossible without the full Board's participation. In addition, if any IRB member believes that any other member is acting improperly, an application to this Court pursuant to Sections B or O of the Rules can resolve the situation. Thus, the IBT's objection is frivolous.

The IBT's proposed interpretation is also nonsensical. By preventing an IRB member from taking any action, of whatever magnitude, in the absence of majority consent, the IBT's interpretation paralyzes the IRB. While the IBT concedes that the IRB members could expend cab fare on the way to an IRB meeting without a majority vote, (Transcript of July 30, 1992 Hearing at p. 95), the IBT drew no other distinction between what constitutes permissible IRB member action and an IRB decision requiring a majority vote. Pursuant to the IBT's interpretation, IRB members could not book airline tickets to Washington to attend the IRB's monthly meetings. Moreover, IRB members would be unable to receive a complaint from an IRB member or keep files on pending matters absent a majority vote. The IBT's interpretation of Section 14(c)(3) recklessly impedes IRB activity in contravention of the express provisions and purpose of the Consent Decree.

2. Scope of IRB Investigative Authority

The Consent Decree, the 1991 IBT Constitution, and the Rules expressly recognize that: "The [IRB] shall exercise such investigative authority as the General President and the General Secretary–Treasurer are presently authorized and empowered to exercise pursuant to the IBT Constitution, as well as any and all applicable provisions of law." Consent Decree, § G(b); 1991 IBT Constitution, Art. XIX, § 14(b)(3); Exhibit A, Rule H(1). The IBT Constitution grants the General President extraordinary disciplinary authority to supervise and investigate matters implicating union affairs. Article VI, Section 1(b) of the 1991 IBT Constitution provides that the General President "shall have general supervision

---

**19.** The Consent Decree does not explicitly contain any reference to such a requirement. Nevertheless, Rule D(2) incorporates this provision of the IBT Constitution. Rule D(2) provides that "[e]xcept as otherwise provided in these Rules, decisions of the IRB shall be made by majority vote."

over the affairs of the Union." 1991 IBT Constitution, Art. VI, § 1(b).

No provision of the IBT Constitution limits this power. In fact, the IBT Constitution does not enumerate the investigative powers of either the General President or the General–Secretary Treasurer. Accordingly, the IRB's investigatory power easily encompasses the powers specifically detailed in these Rules, including taking sworn in-person depositions, auditing or examining books of any IBT–affiliated entity, receiving notice of and having the right to attend all meetings of any IBT–affiliated entity, and establishing a toll-free telephone service to receive reports of corruption. Exhibit A, Rule H(2). Of course, given the General President's and the General Secretary-Treasurer's sweeping investigatory and disciplinary authority, the list of IRB powers specifically enumerated in these Rules is not exhaustive.[20]

The IBT nevertheless contends that the parties did not intend to grant the IRB such authority. It notes that, like the IRB, the Court–Appointed Officers had the investigatory authority of the General President, but unlike the IRB, the Consent Decree listed specific powers of the Court–Appointed Officers. The IBT argues that because the parties specifically listed some of the powers of the Court–Appointed Officers in the Consent Decree, their failure specifically to list those powers for the IRB implies that the IRB does not have such powers.

It is not necessary, however, to fathom the parties' rationale in listing some of the powers contained in the broad grant of authority given to the Court–Appointed Officers, while failing to list specific IRB powers. The IBT's argument is irrelevant because the Consent Decree expressly and unambiguously provides for the powers of the IRB. The parties agreed that the IRB would have the investigatory and disciplinary authority of the General President and

General Secretary–Treasurer. This is a sweeping grant of authority that defies enumeration. It is clear, however, that the powers specifically enumerated in these Rules fall comfortably within the scope of authority the 1991 IBT Constitution grants the General President and General Secretary–Treasurer.

### 3. Enforcement

■ Section K of the Rules provides, in relevant part, that:

1. A decision of the IRB after hearing shall be final and binding. The IRB shall submit the decision to this Court to be entered as an order of the Court. The *appropriate IBT entity, the General President,* and the GEB shall immediately take all action necessary to implement the decision, consistent with the IBT Constitution and applicable federal law. Failure to immediately take all action necessary to implement the IRB's decision shall be deemed a failure to cooperate fully with the IRB.

2. [T]he IRB shall have the authority to take whatever steps are appropriate to ensure proper implementation of any such decision, including, without limitation, *the authority to seek enforcement of its decision from the court.*

Exhibit A, Rules K(1) & (2) (emphasis added).

The IBT objects to the portion of the Rule that requires any entity other than the GEB to implement IRB decisions. The Consent Decree provides that the GEB must implement IRB decisions. Nonetheless, requiring the General President and an appropriate IBT entity to implement IRB decisions, along with the GEB, is the most reasonable interpretation of the language of the Consent Decree and is necessary to effectuate the provisions of the parties' agreement.

As to the General President, Rule K(1) makes clear that the General President, as

---

**20.** For instance, Mr. Carey recently created an Ethical Practices Committee with authority to "vigorously investigate complaints of misconduct and complaints of corruption within the IBT." Carey Dec., ¶ 22. In addition, apparently on the basis of this investigative authority, the General President recently hired an investigative consulting firm to assist the Ethical Practices Committee, and plans to provide support staff and International Representatives to the Committee.

a member of the GEB, must immediately take all action necessary to implement IRB decisions. As to the IBT affiliate, Section G(e) of the Consent Decree provides that an Investigative Report may be referred for action to an "appropriate IBT entity." Following a hearing, however, only the GEB is expressly required to implement the IRB's "final and binding decision." Consent Decree, § G(j). Given an affiliate's role in the preceding stages of the disciplinary process, however, it is likely to have a role in implementing the IRB's post-hearing decision. This provision simply makes clear that GEB implementation of an IRB decision may necessarily entail the assistance and swift action of an IBT affiliate. In addition, it is absurd to suggest that while an IBT affiliate is bound by a "final and binding decision" of the IRB, and during the process must take all action necessary to implement to IRB's Recommendation in a lawful, timely and responsible manner, that this same entity—after a hearing—is suddenly absolved of the responsibility to take any action.

The IBT also objects to the portion of this Section that permits the IRB to enforce its decisions through an application to this Court. The IBT contends that the Consent Decree does not provide the IRB with such authority. The Consent Decree expressly provides, however, that the IRB may take whatever steps are necessary to ensure implementation of its decisions. *Id.*, § G(j). This is a broad grant of authority that necessarily assumes that the IRB may take any number of measures to implement its decisions. One such measure that is entirely appropriate is seeking to enforce its decision through application to this Court.

Finally, Rule K(2) provides that the IRB submit its final and binding post-hearing decision to this Court to be entered as an order of this Court. This modification is necessary to implement the provision of the Consent Decree that makes post-hearing decisions "final and binding." *Id.*, § G(i). Merely calling a decision "final and binding" has little practical effect. The only reasonable interpretation of the "final and binding" clause, and one that is necessary

to implement this provision of the Consent Decree, is that the decision have the force of a court order.

### 4. Cooperation

■ The Rules provide that

All officers, members, employees, *agents* and representatives of the International Union and its affiliated bodies shall cooperate fully with the IRB in the course of any investigation or proceeding undertaken by the IRB *and in any effort by the IRB to enforce its decisions.* Unreasonable failure to cooperate with the IRB shall be deemed conduct that brings reproach upon the Union, and which is thereby within the IRB's investigatory and decisional authority.

Exhibit A, Rule L (emphasis added). By including the word "agent," and the phrase "and in any effort by the IRB to enforce its decisions," the IBT argues that this Rule improperly rewrites Section G(c) of the Consent Decree and Article XIX, Section 14(i) of the IBT Constitution. Despite this argument, the contested provisions of this Rule contain the most reasonable interpretations of the provisions of the Consent Decree and IBT Constitution. The Rule merely clarifies that "officers, members, employees, and representatives of the IBT" include agents. In addition, the Rule simply makes clear that included in "the course of any investigation or proceeding undertaken by the IRB" is any effort by the IRB to enforce its decisions.

### 5. Review of IBT Decisions

■ The IBT objects to Rule M(1), which provides that the IRB shall have the right to be apprised of and review any disciplinary or trusteeship decisions of the "General President, the GEB, or the IBT Ethical Practices Committee." The IBT contends that under the express provisions of the Consent Decree, the IRB has authority only to review decisions of the GEB, and not those of the General President or Ethical Practices Committee. This objection rests on an overly restrictive interpretation of the language of the Consent Decree, ignores the IBT disciplinary review

structure, and threatens effective implementation of the Consent Decree.

The IBT concedes that the Consent Decree vests the IRB with broad authority to review GEB decisions. Both the General President and the Ethical Practices Committee, which operates under the supervision of the General President, are subordinates of the GEB. *See* 1991 IBT Constitution, Art. VI, § 1(b) (the General President's supervision of the affairs of the IBT is "subject at all times to review and approval of the [GEB]"). Moreover, the General President is a member of the GEB. The IRB's broad power to review decisions of the GEB necessarily includes the lesser power to review the decisions of its subordinates and members.

Moreover, a restrictive interpretation of the IRB's authority to review disciplinary and trusteeship decisions risks effective implementation of the Consent Decree. While the General President's authority to make disciplinary decisions and to impose trusteeships is subject to GEB review, a matter will come before the GEB only upon the filing of an appeal from the decision of the General President. Thus, the IBT's interpretation implies that many disciplinary and trusteeship decisions would escape IRB review. Because the power to review disciplinary and trusteeship decisions is a crucial component of the IRB's ability to check corrupt influences in the IBT, such a result stymies the IRB's ability to carry out its mandate under the Consent Decree.

### 6. Communication

█ The IBT objects to Rule N(2), which permits the IRB to "distribute materials to the membership of the IBT … as necessary to further the IRB's activities. The IRB shall have the authority to publish a report … in issues of *The New Teamster* concerning the activities of the IRB." The Consent Decree and the IBT Constitution are silent as to the IRB's ability to communicate with the rank-and-file. Nevertheless, the express goals of the Consent Decree—to eradicate all forms of corruption from the IBT and to return democracy to the Union—require an informed membership.

A membership that is abreast of the efforts of an independent body dedicated to eradicating corruption will know that the IRB is a staunch ally, and thus, will entrust the IRB with information and thereby facilitate the IRB's investigative efforts. *Cf.* Consent Decree, § G(c) (requiring IBT cooperation in IRB operations). Moreover, in the past, secrecy nurtured an atmosphere of fear in the IBT and allowed corruption to flourish. Illuminating corruption in the Union and publicizing efforts to eradicate it are necessary predicates to rank-and-file participation in the democratic process and maintenance of the IBT with integrity and for the sole benefit of the members. Communicating information about corruption and efforts to eradicate it are essential if the membership is to discuss and participate in union affairs without fear of reprisal. *See* Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401, *et seq.* (protecting union members right to self-determination). This conclusion is not novel. In fact, this situation is analogous to that involving a proposed Election Rule that permitted the Election Officer to publish reports in the *International Teamster.* Although not expressly authorized in the Consent Decree, the Second Circuit held that the Election Officer had such authority because "use of the magazine [could be] necessary to ensure an effective rank-and-file election." *United States v. IBT,* 931 F.2d 177, 187 (2d Cir. 1991); *cf.* February 27, 1990 Memorandum & Order, 735 F.Supp. 502 (S.D.N.Y.) (power to communicate with the membership included the authority to list names of IBT members subject to discipline although not explicitly authorized by the Consent Decree), *aff'd,* 907 F.2d 277 (2d Cir.1990).

### 7. IRB Voting

█ The IBT objects to two portions of Rule D(2) that govern circumstances where fewer than all three IRB members are available or willing to render a decision in particular matter. The IBT Constitution provides that IRB "decisions" require a majority vote. 1991 IBT Constitution, Art. XIX, § 14(f); *see, e.g.,* Consent Decree, § G(h) (IRB to issue a written "decision"

after disciplinary hearing). The Consent Decree and IBT Constitution, however, do not address situations where fewer than all three IRB members are available or willing to render a decision in a particular matter. By imperiling the IRB's ability to decide matters, this situation poses a threat to effective implementation of the Consent Decree. In addition, an inability to decide disciplinary matters drastically undercuts the IRB's ability to eradicate corruption in the IBT, and thus, imperils the express goals of the Consent Decree and the intention of the parties.

Rule D(2) attempts to resolve this potentially dangerous situation by allowing one member of the IRB to conduct a hearing and issue a written decision if the other two members of the IRB consent. In addition, the Rule provides that "[i]n the event of a deadlock, where the third member fails or. refuses to vote on the matter, the matter shall be referred to this Court for final disposition." Exhibit A, Rule D(2).

The first part of this Rule, which allows one IRB member to decide disciplinary matters, is compelled by the language of the Consent Decree, which authorizes the IRB to function in the face of what might be a great number of disciplinary matters. In addition, this provision is a reasonable interpretation of the Consent Decree's majority vote provision. When the IRB invokes this Rule, it will have unanimously decided that the best course of action under the circumstances is to allow one member to conduct a hearing and issue a written decision. A rigid interpretation of the Consent Decree that prevents the IRB from vigorously pursuing disciplinary matters necessarily is inconsistent with the purposes of the Consent Decree and the IRB's role as envisioned by the parties.

The second part of Rule D(2), which permits application to this Court in the event of a deadlock between two IRB members, also comports with the language of the Consent Decree. The Consent Decree compels resolution of disciplinary matters. A disciplinary matter evades resolution, however, if two IRB members deadlock and resort to this Court is prohibited. More-over, the parties agreed that a crucial goal of the Consent Decree was to eradicate corruption from the IBT. Without this Rule, however, a deadlock absolves the subject of an investigation by default rather than on the merits. A rule that remedies this situation thus advances an express goal of the Consent Decree and also comports with the intention of the parties. Rule D(2) not only remedies this situation, but does so in a manner that protects the rights of the subject of a disciplinary investigation or hearing and the interests of the general membership in investigating possible corruption in the Union.

### 8. Staff for IRB Members

■ The Consent Decree expressly permits the IRB to "hire a sufficient staff of investigators and attorneys" to conduct investigations. Consent Decree, § G(a). Furthermore, the IBT "shall pay all costs and expenses of the [IRB] and its staff." *Id.*, § G(1). The IBT Constitution provides that the IRB may use staff "to assist in the exercise of the [IRB's] powers and the performance of its duties." 1991 IBT Constitution, Art. XIX, § 14(e). The Rules for IRB operation provide that individual IRB members "may employ personal staff, including but not limited to secretaries and attorneys, to assist them in the performance of the their functions." Exhibit A, Rule E(2). In addition, the Rules provide that "[e]ach IRB member, with the consent of the other IRB members, may designate one or more assistants to act on the member's behalf and to aid in carrying out the member's duties." *Id.*, Rule E(3).

The IBT objects to an interpretation of the Consent Decree that allows individual IRB members to hire personal staff at IBT expense. The IBT would have this Court interpret the Consent Decree's use of the phrase "IRB ... staff" to refer exclusively to the IRB as an entity, and not to its members as well. This interpretation is unreasonably restrictive and would interfere with the operation of the IRB. The IRB is an inanimate entity, created by the Consent Decree, that cannot act unless its members act. Stating that the "IRB" must fulfill its mandate under the Consent

Decree necessarily means that each IRB member must be able to discharge his or her responsibilities. IRB members could not perform these responsibilities with one central staff housed in IBT headquarters in Washington. Because individual IRB members may maintain offices outside Washington, D.C., they cannot practically use a central staff in Washington to perform daily tasks. Instead, each IRB member requires a personal staff. Thus, reference to "IRB staff" means the staff of the individual IRB members as well as the staff of the IRB as an entity.[21] Moreover, the IBT's interpretation of the staffing provisions of the Consent Decree is illogical. The IBT concedes that the IRB as an entity may employ a staff. Thus, even under the IBT's interpretation, the IRB members can hire an "IRB staff" and simply assign them to work with individual IRB members wherever they are located.

The IBT also objects to a provision of the Rules that allows an "IRB member, with the consent of the other IRB members, to designate one or more assistants to act on the member's behalf." *Id.*, Rule E(3). Each IRB member must perform a vast number of tasks to discharge the duties of IRB office. Personal attention to each is impracticable. While designees may not render ultimate "decisions," they may perform any number of tasks crucial to IRB functioning. For instance, IRB members are entitled to attend meetings of any IBT-affiliated entity. It may often be impracticable for an IRB member to attend these meetings even though attendance is crucial to the IRB's mission. Indeed, attendance at two separate meetings is impossible when they occur at approximately the same time in different locations. An IRB member will be able to discharge his or her responsibilities in this situation only if a designee may perform the task. Of course, such designation is proper only with the consent of the other IRB members.

### 9. Independence of IRB Members

 Rule F(3) provides that "[n]o member of the IRB or its staff, including the Chief Investigator, shall, at the same time as he holds any position with the IRB, hold any position with the Government, the IBT, or any IBT affiliate, other than membership in the IBT." This Rule prohibits simultaneous service on the IRB and service in the Government or IBT office. The Rule, however, allows IBT members to serve on the IRB.

The requirement of independence is expressly contained in the title of the "Independent Review Board," and is implicit throughout the Consent Decree. The Independent Review Board is broadly empowered to eliminate corrupt elements of the IBT. Such a task requires detachment, for the very presence in the Consent Decree of an IRB—like the Court–Appointed Officers before it—testifies to the difficulties of internal policing. Therefore, to accomplish its tasks, each IRB member must be fair and independent. A specific example illustrates this point nicely. The IBT's designee to the IRB, Harold E. Burke, is currently the Special Assistant to the General President. It is possible that Mr. Burke's conduct as the Special Assistant to the General President could become the subject of an IRB investigation. In addition, the conduct of the Carey Administration, of which Mr. Burke is a member, may be subject to IRB scrutiny. Moreover, Mr. Burke will soon be required to review the adequacy of the Carey Administration's implementation of IRB decisions and the propriety of Mr. Carey's own disciplinary and trusteeship decisions. *Id.*, §§ G(j), (k). Such a situation presents an untenable conflict of interest.

In addition, Section G(h) of the Consent Decree requires the IRB to conduct fair and impartial hearings. The absence of a truly independent Board threatens the IRB's ability to comply with Section G(h), and also imperils the rights of disciplined members to a fair and impartial hearing.

---

**21.** An IRB member may hire personal staff without the consent of the other IRB members because such conduct does not constitute a "decision" requiring a majority vote of the Board. *See supra,* pp. 67–69.

At the very least, a lack of independence creates an intolerable appearance of bias.

Nonetheless, the IBT argues that Rule F(3) is an impermissible expansion of the Consent Decree, which places no restrictions on the IBT's power to appoint a designee. The IBT fails to realize that Rule F(3) does not restrict the IBT's choice of designees to the Review Board. The IBT can appoint anyone it chooses; if that designee holds union office, however, the designee must relinquish that office before serving on the IRB.

### 10. Indemnification of IRB Members

■ Rule G requires the IBT to purchase insurance or indemnify from its own funds IRB members, the Chief Investigator, and persons acting on their behalf, for personal liability incurred as a result of their conduct on behalf of the IRB. Exhibit A, Rule G. The IBT objects to this provision on the ground that the Consent Decree does not expressly require the IBT to incur such an expense. The Consent Decree and the IBT Constitution, however, expressly obligate the IBT to pay "all costs and expenses of the [IRB] and its staff." Consent Decree, § G(1); *see* Exhibit A, Rule F(1). The contested Rule merely expresses a specific IRB expense. Indeed, the IBT Constitution expressly contemplates similar payment for expenses by IBT officers or representatives acting on behalf of the Union. *See* 1991 IBT Constitution, Art. IX, § 9(a). Moreover, failure to indemnify IRB members and staff will chill their ability to act vigorously in the campaign against corruption.

### 11. Applications

■ The IBT objects to Rule O, which provides in relevant part that "the IRB or any member of the IRB may make application to this Court at any time and for any reason that touches upon any aspect of the IRB." It contends that the Consent Decree does not expressly vest IRB members with the power to bring an application before this Court. Effective implementation of the Consent Decree, however, requires that IRB members have the authority to bring applications before this Court.

The Consent Decree expressly grants this Court continuing jurisdiction over the Consent Decree: "[t]his Court has jurisdiction over the subject matter of the action ... and shall retain jurisdiction over the case until further order of the Court." Consent Decree, § A. The IRB is a creature of the Consent Decree, and as such, its decisions and the conduct of its members remain subject to this Court's exclusive jurisdiction. Similarly, disputed issues involving the IRB's authority, operation, or purpose are exclusively within this Court's jurisdiction. Applications to this Court are necessary to resolve these issues when they arise. Failure to allow the IRB to make applications to this Court threatens the IRB's ability to operate as agreed by the parties. The IBT's objection also fails to recognize that even if an IRB member is without recourse to this Court, he or she can simply ask one of the parties to raise the issue in an application.

### 12. Investigative Reports and IBT Action

■ After the IRB makes an Investigative Report, the Consent Decree requires that it refer the matter to the appropriate IBT entity. Consent Decree, § G(e). The Consent Decree then provides that "[t]he IBT entity to which a matter is referred shall thereupon *promptly* take whatever action is appropriate under the circumstances." *Id.* (emphasis added). In addition, the Consent Decree provides that "[w]ithin 90 days of the referral, the IBT must make written findings setting forth the specific action taken and the reasons for that action" *Id.* The IRB is authorized to monitor all matters it has referred for action, and "if, in its sole judgment, a matter has not been pursued in a lawful, responsible, or timely manner, or that the resolution proposed by the relevant IBT entity is inadequate under the circumstances," the IRB shall notify the relevant IBT entity of its decision. *Id.*, § G(f). Within 10 days of this notice, the IBT entity must "set forth in writing any and all additional actions it has taken and/or will take to correct the defects set forth in said notice and a deadline by which said action must be completed." *Id.*, § G(g). The IRB

shall then issue a written decision as to the adequacy of the IBT entity's action. If the IRB determines that the IBT entity has failed "to remedy the defects" specified by the IRB, the IRB shall "promptly convene a hearing." *Id.*

■■■ Essentially, the Consent Decree envisions a six-step investigatory process once the IRB issues an Investigative Report: (1) the IBT entity must act promptly; (2) the IRB must monitor the IBT entity's handling of the matter to ensure that the IBT entity acts in a lawful, responsible, and timely manner; (3) the IBT entity to which the matter is referred must file a Report on its resolution of the matter within 90 days; (4) anytime before the IBT entity issues its report, the IRB may determine that a matter is not being pursued in a lawful, responsible and timely matter and must notify the IBT entity of that decision; (5) within ten days of receiving this notice, the IBT entity involved has to issue a Report explaining what it has done to address the IRB's concerns; (6) if the IRB is still not satisfied with the IBT entity's handling of the matter, it will promptly convene a hearing to resolve the matter. The Rules give steps (1), (4) and (5) their most reasonable interpretation in light of the purpose and language of the Consent Decree.

As to step (1), the Rules provide an interpretation of the word "promptly." Rule I(4) requires the IRB to specify in its Investigative Report what will constitute "prompt" action in a particular matter. The Rule provides that "[t]he IRB shall include in the Investigative Report the number of days—up to a maximum of 90 days—in which the IBT must resolve a referred matter in order to have acted in a lawful, responsible, and timely manner." Exhibit A, Rule I(4). This Rule allows the IRB, which will be most familiar with the facts and circumstances of a particular matter, to determine what constitutes "prompt" action. In addition, the Rule protects the appropriate IBT entity by assuring that it is aware of what the IRB initially considers "prompt" action taken "in a ... timely manner." Consent Decree, §§ G(e)–(f). The 90 day time limit merely

recognizes that the IBT entity to which a matter is referred must file a Report within 90 days; because an IBT entity must act before it can file the Report, the Consent Decree compels action within 90 days. *See Id.,* § G(e).

As to step (4), the Rules simply make clear that the IRB's deadline for action pursuant to step (1) is separate and distinct from its power to find that an IBT entity has not handled a referred matter in a "lawful, responsible, and timely manner." In other words, even before the deadline for action expires, the IRB in its discretion may conclude that an IBT entity is not acting in a "lawful, responsible, and timely manner," and then give notice of this pursuant to step (4). Thus, the Rules provide that "[i]f the IRB, *at any time after it issues its Investigative Report,* determines ... that a matter is not being pursued in a lawful, responsible and timely manner," it may issue notice pursuant to step (4). Exhibit A, Rule I(7). Such an interpretation recognizes that nothing in the Consent Decree limits when the IRB can determine that a matter is not being "pursued in a lawful, responsible, and timely manner." By enabling the IRB to take action whenever it views the IBT's anti-corruption efforts as inadequate, this Rule furthers a central purpose of the Consent Decree.

As to step (5), Rule I(8) provides that the IBT entity involved "shall file an affidavit setting forth" its response to the IRB's step (4) notice. This portion of the Rule merely specifies the type of "writing" the IBT entity must use to respond to the IRB step (4) notice. An affidavit ensures that the IBT entity is aware of the seriousness of the disciplinary process, while it also promotes care and consideration in the description of completed or contemplated action. Moreover, by providing an additional incentive for the IBT entity to report truthfully, an affidavit requirement comports with Section G(c) of the Consent Decree, which compels an IRB entity to cooperate with the IRB.

13. Compensation of IRB Members

■■■ Rule F(2) addresses the compensation for IRB members and the Chief Inves-

tigator. This Rule is based on Section G(1) of the Consent Decree, which provides that "the IBT shall pay all costs and expenses of the Independent Review Board and its staff (including all salaries of Review Board members and staff)." Based on the language of this provision, there can be no reasonable dispute that the IBT must compensate the IRB members and staff. The issue remains the level of compensation.

The Government, in its application, proposed a rule that compensated IRB members based on their billable hours, subject to a $100,000 salary cap, with adjustments for cost of living increases from year-to-year. Rule F(2) modifies the Government's proposed rule by compensating IRB members and the Chief Investigator according to their billable hours while also providing for a $100,000 guaranteed salary. Exhibit A, Rule F(2).

As previously noted, the IRB is an inanimate entity, created by the Consent Decree, that cannot act unless its members act. Obviously, then, the IRB is only as effective and efficient as its staff and members. Given the IRB's central role in eradicating corruption in the IBT and restoring union democracy, it is essential that the IRB attract extraordinarily talented members and staff. In fact, attracting such talent is crucial to the successful implementation of the Consent Decree. To attract such talent, IRB members and staff must be compensated at market rates based upon their usual hourly rate. Indeed, the IBT has recognized the need to pay market rates to attract quality talent. In litigating various provisions of the Consent Decree, the IBT has employed Jed Rakoff of Mudge, Rose, Guthrie, Alexander and Ferdon at an hourly rate of $360, as well as Brendan Sullivan of Williams & Connolly at an hourly rate of $375. (Cronin Dec., at p. 3). An inflexible compensation plan is necessarily incompatible with a market-rate approach because it is subject to manipulation: an IRB member, for instance, who is normally compensated on the basis of billable hours, could exceed the $100,000 salary cap in a matter of months if the IRB becomes engaged in needless litigation or is misled to pursue frivolous investigations.

Such a cap is thus an impediment to attracting talented individuals to work with the IRB. While a cap will deter qualified individuals from working with the IRB, a guaranteed salary is necessary initially to attract quality individuals to these positions. The IRB is charged with an awesome responsibility that involves a vast number of tasks; a salary floor of $100,000 will entice qualified individuals to undertake this intimidating assignment.

## III. CONCLUSION

Promulgation of the Rules is necessary to implement the parties' agreement and is also a reasonable interpretation of the Consent Decree. The IRB is as an independent agent of reform that will combat the influence of La Cosa Nostra and other corrupt forces in the IBT while monitoring the IBT's efforts in this sphere of union activity. Like its predecessors, the new IBT administration has professed dedication to reform while urging a restrictive interpretation of the Consent Decree that effectively thwarts this agent of reform. The current IBT administration promises reform, but its actions presage toleration of organized crime's influence in union affairs and complacency in the face of corruption. Rather than dedication to maintaining the IBT democratically, with integrity, and for the sole benefit of the membership, the IBT's objections to the IRB suggest a dedication to maintaining the IBT autocratically, with ignominy, and for its own purposes. Maintaining a democratic union that is free of La Cosa Nostra influence and corruption requires perpetual vigilance. Whether or not the new IBT administration's professed dedication to reform is genuine, these Rules ensure that the IRB can function pursuant to the parties' agreement as an agent of reform.

IT IS HEREBY ORDERED that the Government's application seeking the promulgation of rules for the operation of the IRB is granted.

IT IS FURTHER ORDERED that Exhibit A shall constitute the Rules and Procedures for Operation of the Independent Re-

view Board for the International Brotherhood of Teamsters.

IT IS FURTHER ORDERED that the Rules contained in Exhibit A are effective immediately.

IT IS FURTHER ORDERED that the IBT, all subordinate entities of the IBT, and all members of the IBT are bound by the Rules contained in Exhibit A.

SO ORDERED.

## EXHIBIT A

*Rules and Procedures for Operation of the Independent Review Board for the International Brotherhood of Teamsters*

### A. Introduction

1. These "Rules and Procedures for Operation of the Independent Review Board of the International Brotherhood of Teamsters" (the "Rules") emanate from the voluntary settlement in the action commenced by plaintiff United States of America (the "Government") against defendants the International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") in *United States v. International Brotherhood of Teamsters*, No. 88 Civ. 4486 (S.D.N.Y.) (DNE). This settlement is embodied in the voluntary consent order entered on March 14, 1989 (the "Consent Decree"). Pursuant to the Consent Decree, this Court retains exclusive jurisdiction to implement the Consent Decree and to entertain future applications by the parties.

2. The Consent Decree provides for the establishment of an Independent Review Board (the "IRB") for the IBT, comprised of a member appointed by the Attorney General of the United States of America on behalf of the Government, a member appointed by the IBT, and a third member chosen by the Government and IBT appointees. These Rules are drawn from the Consent Decree, judicial decisions regarding the Consent Decree, and the IBT Constitution as amended at the 1991 IBT International Convention (the "1991 IBT Constitution"). These Rules are intended to govern the operation of the IRB. The parties,

and the officers, members, employees, representatives, agents and affiliates of the IBT, should consult these Rules for information on IRB operations.

3. This Court retains exclusive jurisdiction to decide any and all issues relating to the purpose, operation, and authority of the IRB and the interpretation of these Rules.

4. Interpretation of these Rules shall be guided by the principles, as set forth in the Consent Decree, that "there should be no criminal element or La Cosa Nostra corruption of any part of the IBT," and that "it is imperative that the IBT, as the largest trade union in the free world, be maintained democratically, with integrity and for the sole benefit of its members and without unlawful outside influence."

### B. Term of Office

The initial term of office of each IRB member shall be until the completion of the 1996 International Convention, and thereafter the term of office shall be five years. Each IRB member may be reappointed to additional terms by that member's appointing entity. No IRB member may be removed from office except upon application to this Court by the Government or the IBT alleging malfeasance or dereliction of duty. In the event of a vacancy during a term of a member of the IRB, a replacement shall be selected in the same manner as the person who is being replaced was selected.

### C. IRB Offices

1. The IRB shall operate from offices as close as practicable to the International Union's headquarters in Washington, D.C. The IRB shall have the authority to conduct hearings at such locations as the IRB members deem appropriate.

2. IRB members need not be present at the central IRB offices on a full-time basis, and may perform their functions (other than conducting IRB meetings and disciplinary hearings, which shall be held at such locations as the IRB members deem appropriate) at their professional offices or other appropriate locations.

### F. Salaries and Finances

### D. Meetings and Decisions of the IRB

1. The IRB shall meet, not less than once a month, at its offices, or at such other place as is fixed by the IRB members. The IRB may meet and take action by telephone conference.

2. Except as otherwise provided by these Rules, a quorum of the IRB shall be required to conduct any of its business. A quorum shall consist of at least two members of the IRB. Except as otherwise provided by these Rules, decisions of the IRB shall be made by majority vote. One IRB member, with the consent of the other two, may be authorized to conduct a hearing pursuant to Paragraph "J. Hearings," and issue a written decision on any matter. In the event of a deadlock, in a situation where two IRB members have voted, the third IRB member shall be consulted and shall cast the deciding vote. In the event of a deadlock, where the third member fails or refuses to vote on the matter, the matter shall be referred to this Court for final disposition.

### E. IRB Staff

1. The IRB shall employ a Chief Investigator to exercise the authority and perform the tasks enumerated in Paragraph "H. Investigations" of these Rules. The IRB shall also employ a staff of attorneys, investigators, auditors, accountants and other personnel as the IRB deems necessary and proper for completion of the IRB's tasks.

2. Each IRB member may employ personal staff, including but not limited to secretaries and attorneys, to assist them in the performance of their functions.

3. Each IRB member, with the consent of the other IRB members, may designate one or more assistants to act on the member's behalf and to aid in carrying out the IRB member's duties.

4. The IRB may designate a Staff Manager, who shall manage the IRB's administrative functions.

1. The IBT shall pay all costs and expenses (including compensation) of the IRB, its staff, and the staff of the individual IRB members. These costs and expenses include, but are not limited to: (a) the costs associated with the performance of any of the functions outlined in these Rules; (b) the cost of communications pursuant to Paragraph "N. Communications"; and (c) the cost of establishing and operating a toll-free telephone service for purposes of receiving reports of corruption involving the IBT and its affiliates pursuant to Paragraph "H. Investigations".

2. The IRB members and the Chief Investigator shall be paid an annual salary of $100,000, with yearly cost-of-living adjustments, to be paid in twelve equal monthly installments. The IRB members and the Chief Investigator, however, shall keep track of their time on an hourly basis, and at the end of each year the IBT shall pay each IRB member and the Chief Investigator any monies due beyond the $100,000 based upon an accounting of time spent and the hourly rates charged by the individual. If any member of the IRB or the Chief Investigator does not have regular hourly rates, the IRB shall set a reasonable hourly rate for that individual's services. Staff for the IRB and staff for individual IRB members shall be compensated as directed by the IRB. All costs and expenses of the IRB and its staff and the staff of the individual IRB members are to be billed to the IBT on a monthly basis. The IBT must pay all such bills within 14 days.

3. No member of the IRB or its staff, including the Chief Investigator, shall, at the same time as he holds any position with the IRB, hold any position with the Government, the IBT, or any IBT affiliate, other than membership in the IBT.

4. With the consent of the Government, the IRB may draw upon the $100,000 fund previously created for the Independent Administrator and Investigations Officer, and the $150,000 fund previously created for the Election Officer. The IRB shall submit quarterly expense and fee applications to the IBT General President, this Court, and

the Office of the United States Attorney for the Southern District of New York. The parties shall have fourteen business days to submit to this Court their objections to the expense and fee application. If the IBT submits no objections to the application, or if this Court overrules the IBT's objections, the IBT shall promptly reimburse the funds for the approved amount.

5. The IRB, its staff, investigators, auditors, accountants, attorneys, and other employees, shall be provided with sick pay, holiday pay, vacation pay, health insurance and pension coverage, payment of FICA self-employment tax, and other benefits equivalent to those provided to similarly situated IBT employees.

### G. Indemnification

The IBT shall purchase a policy of insurance in an appropriate amount to protect the members of the IRB, the Chief Investigator, and persons acting on their behalf from personal liability (or costs incurred to defend against the imposition of liability) for any of their actions on behalf of the IBT, the IRB, or the Chief Investigator. If such insurance is not available, or if the IBT so elects, the IBT shall indemnify the members of the IRB, the Chief Investigator, and persons acting on their behalf from any liability (or costs incurred to defend against the imposition of liability) for conduct taken pursuant to the Consent Decree, the 1991 IBT Constitution, and/or these Rules.

### H. Investigations

1. The IRB shall exercise such investigative authority as the General President and General Secretary–Treasurer are authorized and empowered to exercise pursuant to the 1986 IBT Constitution and/or the 1991 IBT Constitution, as well as any and all applicable provisions of law.

2. The IRB shall investigate any allegations of corruption in the IBT, including, but not limited to: bribery; extortion; embezzlement; use or threats of force or violence against members to interfere with or extort their rights under the 1991 IBT Constitution or their union democracy rights under applicable law, including their rights to assemble, express their views, vote, seek election to office, support the candidates of their choice, and participate in the affairs of the IBT; acceptance of money or other things of value from any employer or agent of an employer, in violation of applicable law; any act of racketeering activity, as defined in applicable law; aiding and abetting any act of racketeering, including the extortion of IBT members' union democracy rights as defined by applicable law; any allegations of domination, control, or influence over any IBT affiliate, officer, member, employee, or representative by any organized crime family or any other criminal group; any allegations of knowing association with a member of La Cosa Nostra or any other person enjoined from participating in Union affairs; conduct that in the IRB's view brings reproach upon the Union; any failure by an IBT entity to pursue and/or decide in a lawful, responsible, and timely manner a matter that has been referred to it under "I. Investigative Reports and IBT Action"; and any failure to cooperate fully with the IRB in any investigation of the foregoing.

3. The IRB's authority shall include, but not be limited to, the authority:

a. To cause the audit or examination of the books of the IBT or any affiliated IBT body at any time to the extent that the IRB may determine necessary.

b. To receive, no less than one week prior to any meeting of the GEB, the agenda for the meeting, and to attend meetings or portions of meetings of the GEB that relate in any way to the rights, duties or activities of the IRB.

c. To take and require sworn statements or sworn in-person examinations of any officer, member, employee, representative, or agent of the IBT, provided that the IRB has given the person to be examined at least ten (10) days advance notice in writing and also provided that the person to be examined has the right to be represented by an IBT member or legal counsel of the person's choosing during the course of said examination. Failure to appear for

a duly-noticed in-person examination shall be deemed a failure to cooperate fully with the IRB.

d. To take, upon notice and application for cause made to this Court, which shall include affidavit(s) in support thereof, the sworn statements, or sworn in-person examinations of persons not covered in the foregoing subparagraph "c."

e. To attend meetings of any affiliated body of the International Union.

4. The IRB may consult with and receive information from the Investigation Officer, the Independent Administrator and the Election Officer, appointed pursuant to the Consent Decree.

5. The IRB may establish a toll-free telephone service for purposes of receiving reports of corruption involving the IBT and its affiliates.

6. Each member of the IRB shall have the authority to refer matters to the Chief Investigator for investigation in accordance with these Rules.

7. The Chief Investigator shall have the same authority as the IRB as provided in this Paragraph *"H. Investigations."*

*I. Investigative Reports and IBT Action*

1. Upon completion of an investigation, the IRB shall prepare, or shall direct the Chief Investigator to prepare, a written report (the "Investigative Report") detailing proposed findings, charges, and recommendations concerning the discipline of IBT officers, members, employees, agents and representatives, or concerning recommendations that any IBT affiliated body be placed in trusteeship.

2. In the event that the Chief Investigator prepares an Investigative Report, the IRB may approve, modify, or reject the Chief Investigator's Investigative Report, or may direct that the Chief Investigator conduct further investigation in connection with the Investigative Report.

3. The IRB shall make available a copy of any Investigative Report for public inspection at the IBT office in Washington, D.C.

4. The IRB shall submit any Investigative Report to the appropriate IBT entity, the General President, the General Executive Board, and the IBT Ethical Practices Committee. The IRB may designate a matter as an original jurisdiction case for General Executive Board review if the matter concerns an offense committed against an officer of the International Union or the International Union. The IRB shall include in the Investigative Report the number of days—up to a maximum of 90 days—in which an IBT entity must resolve a referred matter in order to have acted in a lawful, responsible, and timely manner.

5. Upon referral, the IBT entity to which a matter is referred shall promptly undertake whatever action is appropriate under the circumstances to resolve the referred matter, as provided by the IBT Constitution, applicable law, and these Rules. The IBT entity shall resolve the referred matter within the time prescribed by the IRB in the Investigative Report. The IRB shall monitor all matters that it has referred for action, and may make use of any powers enumerated in Paragraph *"H. Investigations"* herein in doing so. The IRB may also direct the Chief Investigator to ensure that the IBT entity resolves a referred matter in a lawful, responsible, and timely manner.

6. Within 90 days of the referral, the IBT entity to which a matter has been referred by the IRB shall file with the IRB written findings setting forth the specific actions taken and the reasons for that action.

7. If the IRB, at any time after it issues its Investigative Report, determines, in its sole judgment, that a matter is not being or has not been pursued and decided by the IBT entity to which the matter has been referred in a lawful, responsible, and timely manner, or that the resolution proposed by the relevant IBT entity is inadequate under the circumstances, the IRB shall notify the IBT affiliate of its view, and the reasons therefor. A copy of said notice

shall be sent by the IRB to the General President and the GEB.

8. Within 10 days of the receipt of the notice described in the preceding paragraph, the IBT entity involved shall file with the IRB an affidavit setting forth any and all additional actions it has taken and/or will take to correct the deficiencies as set forth in the IRB's notice, and shall state the date by which such action was or will be completed. After receipt and consideration of the IBT entity's affidavit, the IRB shall issue a written determination concerning the adequacy of the additional action taken and/or proposed by the IBT entity. If the IRB concludes that the IBT entity involved has failed to take or propose satisfactory action to remedy the defects specified by the IRB notice described in the preceding subsection, the IRB shall promptly convene a hearing, after notice to all affected parties.

9. Failure to act in a lawful, responsible, and timely manner shall be deemed a failure to cooperate fully with the IRB.

### J. Hearings

1. Prior to any hearing, the IRB or the Chief Investigator, at the IRB's direction, shall serve a copy of the Investigative Report to all affected parties.

2. The person charged or the IBT affiliate subject to trusteeship shall be given a reasonable time, in no event less than 10 days, to prepare a defense.

3. A fair and impartial hearing shall be conducted before the IRB. The purpose of the hearing shall be to determine whether the proposed findings, charges, or recommendations regarding discipline or trusteeship found in the Investigative Report are supported by the evidence.

4. The person charged or the IBT affiliate subject to trusteeship may be represented by an IBT member or by counsel at the hearing.

5. Subject to the other provisions of this Paragraph *"J. Hearings,"* the IRB may incorporate additional procedural safe-guards that in the judgment of the IRB shall ensure a fair hearing.

6. All parties, including the Chief Investigator, shall be permitted to present any facts, evidence, or testimony that is relevant to the issue before the IRB. The hearings shall be conducted under these Rules and the rules and procedures generally applicable to labor arbitration hearings. In order to be sustained, the proposed findings, charges, or recommendations regarding discipline or trusteeship, contained in the Investigative Report, must be supported by a preponderance of reliable evidence.

7. If the proposed findings, charges, or recommendations contained in the Investigative Report regarding discipline or trusteeship are sustained, the IRB shall have the authority to impose any discipline or conditions of trusteeship authorized by the IBT Constitution, the Consent Decree, and applicable law.

8. After the hearing has been conducted, the IRB shall issue a written decision, which shall be sent to the General President, each member of the GEB, and all affected parties.

### K. Enforcement

1. A decision of the IRB after hearing shall be final and binding. The IRB shall submit the decision to this Court to be entered as an order of the Court. The appropriate IBT entity, the General President, and the GEB shall immediately take all action necessary to implement the decision, consistent with the IBT Constitution and applicable federal law. Failure to immediately take all action necessary to implement the IRB's decision shall be deemed a failure to cooperate fully with the IRB.

2. The IRB shall have the right to examine and review actions taken by the appropriate IBT entity, the General President, and the GEB to implement the IRB's decisions. The IRB may make use of any powers enumerated in Paragraph *"H. Investigations"* herein, or may direct the Chief Investigator to ensure that the appropriate IBT entity, the General President, and the GEB properly implement the

IRB's decisions. In the event that the IRB is dissatisfied with the implementation of its decisions by the appropriate IBT entity, the General President, and the GEB, the IRB shall have the authority to take whatever steps are appropriate to ensure proper implementation of any such decision, including, without limitation, the authority to seek enforcement of its decision from this Court.

### L. Cooperation

All officers, members, employees, agents and representatives of the International Union and its affiliated bodies shall cooperate fully with the IRB in the course of any investigation or proceeding undertaken by the IRB and in any effort by the IRB to enforce its decisions. Unreasonable failure to cooperate with the IRB shall be deemed conduct that brings reproach upon the Union, and which is thereby within the IRB's investigatory and decisional authority.

### M. Review of IBT Decisions

1. The IRB shall be apprised of and have the authority to review any disciplinary or trusteeship decision of the General President, the GEB or the IBT Ethical Practices Committee, and shall have the right to affirm, modify, or reverse any such decision. The IRB's affirmance, modification, or reversal of any such decision shall be in writing and shall be final and binding. The IRB shall submit such a decision to this Court to be entered as an order of the Court.

2. The IRB, or, if the IRB so authorizes, the Chief Investigator, may make use of any powers enumerated in Paragraph *"H. Investigations"* to ensure that the General President, the GEB, or the IBT Ethical Practices Committee properly informs the IRB of any disciplinary or trusteeship decision.

3. Failure to inform the IRB of disciplinary or trusteeship decisions of the General President, the GEB or the IBT Ethical Practices Committee, or to enforce any decision of the IRB affirming, modifying, or reversing any IBT disciplinary or trusteeship decision shall be deemed to be a failure to cooperate fully with the IRB.

### N. Communications

1. The IRB shall, on a quarterly basis, report to this Court concerning the activities of the IRB.

2. The IRB shall have the authority to distribute materials to the membership of the IBT (including but not limited to copies of these Rules), as necessary to further the IRB's activities. The IRB shall have the authority to publish materials, including a report, in each and every issue of *The New Teamster* concerning the activities of the IRB.

3. The IRB shall have the authority to inform the General President, the GEB, the Ethical Practices Committee, the IBT and/or its affiliates and membership, of the identities of persons or entities who are or have been the subject of disciplinary action by the IRB or Independent Administrator, and/or who are or have been identified as members or associates of La Cosa Nostra or any other organized crime group, for purposes of informing the members, officers, employees, agents and representatives of the IBT and its affiliates that association with or employment of these persons or entities may be cause for investigative or disciplinary action.

### O. Applications

The IRB or any member of the IRB may make application to this Court at any time and for any reason that touches upon any aspect of the IRB, including but not limited to the purpose, operation, or authority of the IRB. This also includes an application for an order directing the IRB to exercise its authority when one or more of the other members have failed or refused to conduct a hearing, issue a decision, cast a needed vote, or otherwise act as required by these Rules. In reviewing actions of the IRB, this Court shall apply the same standard of review applicable to review of final federal

806

agency action under the Administrative Procedure Act.